## DEFFEBACK v. HAWKE.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF DAKOTA.

Submitted October 14, 1885.—Decided November 16, 1885.

No title from the United States to land known at the time of sale to be valuable for its minerals of gold, silver, cinnabar, or copper can be obtained under the pre-emption or homestead laws, or the town-site laws, or in any other way than as prescribed by the laws specially authorizing the sale of such lands, except in the States of Michigan, Wisconsin, Minnesota, Missouri and Kansas.

A certificate of purchase of mineral land, upon an entry of the same by a claimant at the local land office, if no adverse claim is filed with the register and receiver, and the entry is not cancelled or disaffirmed by the officers of the Land Department at Washington, passes the right of the government to him, and, as against the acquisition of title by any other party, is equivalent to a patent. The land thereby ceases to be the subject of sale by the government, which thereafter holds the legal title in trust for the holder of the certificate.

The officers of the Land Department have no authority to insert in a patent any other terms than those of conveyance, with recitals showing a compliance with the law, and the conditions which it prescribed. The patent of a placer mining claim carries with it the title to the surface included within the lines of the mining location, as well as to the land beneath the surface.

There can be no color of title in an occupant of land, who does not hold under an instrument or proceeding or law purporting to transfer the title or to give the right of possession. Nor can good faith be affirmed of a party in holding adversely, where he knows that he has no title, and that under the law, which he is presumed to know, he can acquire none. So held where, in an action of ejectment for known mineral land by the holder of a patent

of the United States, the occupant set up a claim to improvements made thereon under a statute of Dakota, which provided that "in an action for the recovery of real property, upon which permanent improvements have been made by a defendant, or those under whom he claims, holding under color of title, adversely to the claim of the plaintiff, in good faith, the value of such improvements must be allowed as a counterclaim by such defendant," he not having taken any proceedings to acquire the title under the laws of Congress authorizing the sale of such lands, or to acquire the right of possession under the local customs or rules of miners of the district.

It would seem that there may be an entry of a town site, even though within its limits mineral lands are found, the entry and the patent being inoperative as to all lands known at the time to be valuable for their minerals, or discovered to be such before their occupation and improvement for residences or business under the town site title.

This was an action to recover a parcel of mineral land, situated in the county of Lawrence, in the Territory of Dakota, claimed by the plaintiff under a patent of the United States bearing date on the 31st of January, 1882. The complaint alleged that on the 20th of November, 1877, the plaintiff, being in the actual, peaceable and exclusive possession of the premises, filed his application in the United States land office at Deadwood, in that county and Territory, to enter the land as a placer mining claim; that on the 31st of January, 1878, he entered the same and paid the government price therefor, and that on the 31st of January, 1882, a patent of the United States, conveying a fee simple title to the land, was executed and delivered to him, the land being described as mineral entry No. 8, and mineral lot No. 53; that while thus the owner and in possession of the premises, the defendant, on or about the 1st of July, 1878, with full notice of the plaintiff's title, unlawfully and wrongfully entered upon a portion of the premises, which was particularly described, and ousted the plaintiff therefrom, and had ever since withheld the possession thereof, to his damage of $500.

The complaint also alleged that the value of the rents and profits of the premises from the entry of the defendant had been $800; and it prayed judgment for the possession of the premises, for the damages sustained, and for the rents and profits lost.

To the complaint the defendant put in an answer, admitting that on the 20th of November, 1877, the plaintiff filed in the United States land office his application for a patent of the placer mining claim, described as mineral lot No. 53; that it included the premises in controversy; and that, on the 31st of January, 1878, the plaintiff paid to the receiver of the land office the price of the land per acre, and received from the register and the receiver a certificate or receipt therefor, which payment and receipt were commonly called an entry.

The answer also contained two special pleas, by way of counterclaim, upon which affirmative relief was asked; namely, that the plaintiff be decreed to be a trustee of the premises for the defendant, and be directed to convey them, or an interest in them, to him, or to allow to him compensation for improvements thereon. In the first of these, it set up various matters as grounds to charge the plaintiff, as trustee of the premises, for the defendant. In the second special plea, it alleged improvements made upon the premises, either by the defendant or his grantor, as a ground for compensation under the statute of the Territory.

In the first special plea the answer averred substantially as follows: That on the 28th of February, 1877, the day on which the treaty with the Sioux Indians was ratified, by which the lands in Lawrence County were first opened to settlement and occupation, the land included in mineral lot No. 53, together with a large amount of other land in its immediate vicinity, was appropriated, set apart, and occupied for town-site purposes, and, as such, was surveyed and laid out into lots, blocks, streets, and alleys, for municipal purposes and trade, and was then, and had ever since been known and called the town of Deadwood; that the town then contained a population of two thousand inhabitants, and about five-hundred buildings used as residences or for business, and not for agriculture; that the town was then, and had ever since been, the centre of trade and business west of the Missouri River in the Territory of Dakota, and, at the commencement of this action, contained a population of about three thousand inhabitants, and buildings and improvements of the value of about a million of dollars;

that the land in controversy was one of the lots originally laid out and occupied for town-site purposes, and had always been thus occupied by the defendant or his grantors, with the buildings and improvements thereon, for the purpose of business and trade and not for agriculture; that the placer mining claim, for which the plaintiff filed his application for a patent, as alleged in the complaint, was not located or claimed by him or any other person until after the selection, settlement upon, and appropriation of that and adjacent lands for town-site purposes; and that, on the 29th of July, 1878, the town of Deadwood being unincorporated, the probate judge of Lawrence County entered, at the local land office, the said town site, paid the government price therefor, and received from its officers a receipt for the money and a certificate showing the entry and purchase by him in trust for the use and benefit of the occupants, including the defendant; and that such town site embraced the land covered by the plaintiff's patent.

The answer further alleged, in substance, that thereafter, on the 10th of April, 1879, the commissioner of the General Land Office at Washington ordered a hearing before the land office in Deadwood, between the plaintiff and the probate judge, as trustee for the occupants of the town site, as to the character of the land for mineral purposes; at which hearing it was not disputed that the defendant and other occupants of town lots in Deadwood were the prior appropriators of the land; but the commissioner refused to allow the consideration of any other fact than the mineral character of the land, holding as a proposition of law decisive of and controlling the case and the rights of the parties, that the only question of fact that could be considered was the mineral or non-mineral character of the land, and that the fact of the prior occupation and appropriation of the land for town-site purposes did not confer any rights upon the occupants; that the register and the receiver followed these instructions and decided the controversy solely upon the ground of the mineral character of the land; that their decision, upon appeal to the commissioner of the General Land Office, and thence to the Secretary of the Interior, was affirmed, and those officers, the commissioner and the Secretary, awarded the

land, with the improvements thereon, to the plaintiff, and re-
fused to patent the same, or any interest therein, to the said
probate judge, or to the defendant, but cancelled the entry of
the judge, and directed and caused the patent mentioned in the
complaint to be issued to the plaintiff; whereas, the defendant
insisted that the patent should have contained an exception or
reservation excluding from its operation all town property, and
all houses, buildings, lots, blocks, streets, and alleys, and other
improvements on the land, not belonging to the plaintiff, and
all rights necessary or proper to the occupation, possession, and
enjoyment of the same; that the decision of the commissioner
and the Secretary in awarding the property to the plaintiff, and
refusing to recognize or protect the prior rights of the defend-
ant and other occupants of the town, was contrary to law, and
an erroneous construction thereof; and that, therefore, the
plaintiff, by reason of his patent, held the land in controversy,
and the buildings and improvements thereon, in trust for the
defendant, all of which should be conveyed to him, he offering
to pay his just proportion of the legal expenses of procuring
the patent.

In the second special plea the answer set up that on the 28th
day of February, 1877, one Henry B. Beaman, being one of
the occupants of the town site, was in the peaceable and law-
ful possession of the premises in controversy, with a building
and other improvements thereon, and that, from that time un-
til his conveyance to the defendant, he remained in the contin-
uous occupation thereof, using the same as a town lot for busi-
ness and trade, claiming title thereto in good faith against all
persons, except the United States, and claiming the right to ac-
quire the title from the United States as a town lot; that there-
after the said Beaman sold and conveyed the premises to the
defendant, who purchased them in good faith, and before the
plaintiff acquired any title thereto made permanent improve-
ments thereon of the value of $1300, and that the value of the
land itself without the improvements would not exceed $100.

The answer concluded with a prayer that the plaintiff take
nothing by his suit, and be decreed to convey to the defendant
the premises in controversy, excepting and reserving to himself

the right to mine and extract the precious metals from them, provided, in so doing, he should not materially injure, endanger, or interfere with the buildings and improvements thereon and the necessary use and enjoyment of them by the defendant; and that, in the event it should be determined that the plaintiff was the owner of and entitled to the possession of the premises, then the value of the improvements thereon be specifically found, and the defendant have judgment for the same; and for such other and further relief as might be just with costs.

To each of the special pleas of the answer the plaintiff interposed a general demurrer, on the ground that it did not state facts sufficient to constitute a defence to the action nor a counterclaim in the defendant's favor against him, which was sustained, with leave to the defendant to file an amended answer. The defendant refused to amend, and elected to stand on his pleadings. Judgment was, therefore, entered for the plaintiff. On appeal to the Supreme Court of the Territory, the judgment was affirmed, and the case was brought to this court on appeal.

*Mr. G. C. Moody* for appellant.—The appellant was in actual occupation of the disputed premises several months prior to any attempt by appellee to gain the right of possession thereto by virtue of a location of a mineral claim. In the hearing that was ordered there was no direction to take evidence of the fact whether any vein or mine of valuable metals existed in the land; only in a general way the character of the land for minerals was inquired into. There can be no question but that the appellant had the right to require the appellee to convey if the judge of probate had the right to enter these lands; and if the real question as to whether this lot contained gold, silver, cinnabar or copper, or was included in a valid mining claim, has not been tried before the Land Department, it is not appellant's fault.

Section 2338 of the Revised Statutes contains the following provision, taken from the act of July 26, 1866, 14 Stat. 251, 252: "As a condition of sale in the absence of necessary legislation by Congress, the local legislature of any State or Territory may provide rules for working mines involving easements,

drainage, and other necessary means to their complete development ; and those conditions shall be fully expressed in the patent." Now, it is apparent in this case, by the facts as they appear admitted, that when the Black Hills country was lawfully opened to settlement and occupation as a part of the public domain, becoming such by reason of the abrogation of the Sioux Indian reservation, which covered that country, there existed at the confluence of Deadwood and Whitewood gulches, an important town of at least two thousand inhabitants, engaged in all the business and avocations which such an aggregation of people induces, and which grew rapidly in population thereafter. This town was situated in close proximity to what is a well-known rich quartz mining district or locality. That the lands were mineral in character—that is, that more or less deposits of gold had been brought down from the mines above and found in occasional places in the land whereon the town was situated, was a question hardly worth the trying. The appellee, finding the town there, with all its accumulated wealth of structures, including dwelling houses, business blocks, banking houses, hotels, churches, school houses, court house, and other public buildings, went upon the unoccupied portion of this town, and there found gold. Making his location long after the appropriation of these public lands by the town-site occupants, upon the single theory that the lands on which the town is located were mineral in character, he was awarded all the lands, and the superstructures as well, and people who relied upon the good faith of the government and the hitherto unbroken rule of the Land Department, were despoiled of their possessions and of all the expenditures which they, in good faith, had made to improve this property—and that without even the privilege of making the negative proof of the non-existence in any particular occupied portion of such town that therein there existed no vein or mine of the precious metals. There was no pretence of there being any pre-existing mining claim or possession covering those lands. Can this decision, so transparently unjust, be upheld, or the effect of it enforced by any attempted evasion by the appellee of the real question which was decided by the Department ?

As to the counterclaim for the value of the betterments, a case is made which under the law of the Territory as affirmed by Congress, entitled appellant to have the value of his improvements found and to recover same from appellee. The Betterment Act of this Territory contained these provisions in § 641 of the Code of Civil Procedure, and following: "In an, action for the recovery of real property, upon which permanent improvements have been made by the defendant, or those under whom he claims, holding under color of title adversely to the claim of the plaintiff, in good faith, the value of such improvements must be allowed as a counterclaim by such defendant. The counterclaim in such action must set forth, among other things, the value of the land aside from the improvements thereon, and also, as accurately as practicable, the improvements upon the land, and the value thereof. Issues may be joined and tried as in other actions, and the value of the land, aside from the value of the improvements thereon, and the separate value of the improvements must be specifically found by the verdict of the jury, the report of the referee, or the finding of the court. The judgment of the court upon such finding, if in favor of the plaintiff, for the recovery of the real property, and in favor of the defendant for the counterclaim, shall require such defendant to pay to the plaintiff the value of the land, as determined by such finding, and the damages, if any, recovered for withholding the same, and for waste committed upon such land by the defendant, within sixty days from the rendition of such judgment, and in default of such payment by the defendant, that the plaintiff shall pay to the defendant the value of the improvements, as determined by such finding, less the amount of any damages so recovered by plaintiff for withholding the property, and for any waste committed upon such land by the defendant, and until such payment, or tender and deposit in the office of the clerk of the court in which such action is pending, no execution, or other process shall issue in such action to dispossess such defendant, his heirs, or assigns." The act of Congress of June 1, 1874, 18 Stat. 50, entitled "An Act for the benefit of occupying claimants," provides that "when an occupant of land, having color of title, in good faith

has made valuable improvements thereon, and is, in the proper action, found not to be the rightful owner thereof, such occupant shall be entitled in the Federal courts to all the rights and remedies, and, upon instituting the proper proceedings, to such relief as may be given or secured to him by the statutes of the State or Territory where the land lies, although the title of the plaintiff in the action may have been granted by the United States after said improvements were so made."

The improvements made by the appellant and the person under whom he claims are alleged to be permanent improvements; the appellant was holding under color of title adversely to the claim of the appellee in good faith, and the value of such improvements is alleged. These facts ought to be sufficient to entitle the appellant to the judgment which he prayed for relating thereto.

*Mr. A. J. Plowman* for appellee.

MR. JUSTICE FIELD delivered the opinion of the court. After stating the facts in the language above reported, he continued:

The principal question presented by the pleadings for our consideration, is whether, upon the public domain, title to mineral land can be acquired under the laws of Congress relating to town sites. The plaintiff asserts title to mineral land under a patent of the United States founded upon an entry by him under the laws of Congress for the sale of mineral lands. The defendant, not having the legal title, claims a better right to the premises by virtue of a previous occupation of them by his grantor as a lot on a portion of the public lands appropriated and used as a town site, that is, settled upon for purposes of trade and business, and not for agriculture, and laid out into streets, lots, blocks, and alleys for that purpose.

In several acts of Congress relating to the public lands of the United States, passed before July, 1866, lands which contained minerals were reserved from sale or other disposition. Thus, the pre-emption act of 1841, 5 Stat. 453, excepts from pre-emption and sale "lands on which are situated any known salines or mines," Ib. 455, ch. 16, § 10; and the act of 1862,

extending to California the privilege of settlement on unsurveyed lands, previously authorized in certain States and Territories, contains a clause declaring that the provisions of the act "shall not be held to authorize pre-emption and settlement of mineral lands." 12 Stat. 409, 410, ch. 86, § 7. Similar exceptions were made in grants to different States, and in grants to aid in the construction of railroads. Thus, in the grant to California of ten sections of land, for the purpose of erecting the public buildings of that State, there is a proviso "that none of said selections shall be made of mineral lands." 10 Stat. 244, 248, ch. 145, § 13. And in the grants to the Union Pacific Railroad, and its associated companies, to aid in the building of the transcontinental railroad and branches, there is a proviso declaring that all mineral lands, other than of coal and iron, shall be excepted from them. 12 Stat. 489, ch. 120, § 3; 13 Stat. 356, 358, ch. 216, § 4. A similar exception is made in grants for universities and schools; and, in the law allowing homesteads to be selected, it is enacted that mineral lands shall not be liable to entry and settlement for that purpose.

By the act of July 26, 1866, this policy of reserving mineral lands from sale or grant was changed. That act declared that the mineral lands of the public domain were free and open to *exploration and occupation* by all citizens of the United States, and persons who had declared their intention to become citizens, subject to such regulations as might be prescribed by law, and to the local customs or rules of miners in mining districts, so far as they were not in conflict with the laws of the United States. 14 Stat. 251, ch. 262, § 1. It then provided for acquiring by patent the title to " veins or lodes of quartz, or other rock, in place, bearing gold, silver, cinnabar, or copper." On the 9th of July, 1870, this act was amended so as to make placer claims, including all forms of deposit, " excepting veins of quartz or other rock in place," subject to entry and patent, under like circumstances and conditions, and upon similar proceedings, as those provided for vein or lode claims. 16 Stat. 217, ch. 235, § 12. The act of May 10, 1872, to promote the development of the mining resources of the United States, repealed several sections of the act of 1866, and,

among others, the first section, but enacted in place of it a provision declaring that "all valuable mineral deposits" in lands belonging to the United States, both surveyed and unsurveyed, were "free and open to *exploration and purchase*, and the lands in which they are found to occupation and purchase," subject to the conditions named in the original act. 17 Stat. 91, ch. 152, § 1. Other sections pointed out, with particularity, the procedure to obtain the title to veins, lodes, and placer claims, and defined the extent of each claim to which title might be thus acquired. By the act of February 18, 1873, mineral lands in the States of Michigan, Wisconsin, and Minnesota were excepted from the act of May 10, 1872, and those lands were declared to be free and open to exploration and purchase, according to legal subdivisions, in like manner as before. 17 Stat. 465, ch. 159. The provisions of the act of 1872, with the exceptions made by the act of 1873, were carried into the Revised Statutes, which declare the statute law of the United States upon the subjects to which they relate, as it existed on the 1st of December, 1873. Rev. Stat. § 2345. All other provisions contained in the acts, of which any portion is embraced in this revision, are in express language repealed. § 5596. No reference, therefore, can be had to the original statutes to control the construction of any section of the Revised Statutes, when its meaning is plain, although in the original statutes it may have had a larger or more limited application than that given to it in the revision. *United States* v. *Bowen*, 100 U. S. 508, 513.

Turning to that portion of these statutes treating of mineral lands and mining resources, which is contained in chapter six of title XXXII., we find that its first section declares that "in all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law." § 2318. Title, therefore, to lands known at the time to be valuable for their minerals, could only have been acquired after December 1, 1873, under provisions specially authorizing their sale, as found in these statutes, except in the States of Michigan, Wisconsin, and Minnesota, and after May 5, 1876, in the States of Missouri and Kansas. By the act of Congress of this latter date, "de-

posits of coal, iron, lead, or *other mineral*," in Missouri and Kansas were excluded from the operation of the act of May 10, 1872, that is, from such provisions of that act as were re-enacted in the Revised Statutes. 19 Stat. 52, ch. 91. In those portions of the Revised Statutes which relate to pre-emption and to homestead entries the clauses from the original acts excepting mineral lands are retained. §§ 2258, 2302.

If now we turn to the laws relating to town sites on the public lands, and the provisions authorizing the sale of lands under them, or to the entry of town sites for the benefit of their occupants, as contained in the Revised Statutes, we shall find a similar exception from sale or entry under them of mineral lands. Title XXXII. of the Revised Statutes contains the law as to the public lands. Chapter eight of that title relates to the reservation and sale of town sites on the public lands. It contains provisions authorizing the President to reserve from the public lands town sites on the shores of harbors, at the junction of rivers, important portages or at any natural or prospective centres of population; it declares when the survey of such reservations into lots may be made and the sale of the land had; it prescribes with particularity the manner in which parties who have founded, or who may desire to found, a city or town on the public lands may proceed, and the title to lots in them be acquired. It also provides for the entry, at the proper land office, of portions of the public lands occupied as a town site, such entry to be made by its corporate authorities, or, if the town be unincorporated, by the judge of the county court of the county in which the town is situated, the entry to be in trust for the use and benefit of the occupants, according to their respective interests. The chapter also contains many other clauses respecting town sites, but with provisions against the acquisition of title to mineral land under them. In one section it declares that " where mineral veins are possessed, which possession is recognized by local authority, and to the extent so possessed and recognized, the title to town lots to be acquired shall be subject to such recognized possession, and the necessary use thereof," with a reservation, also, that nothing in the section shall be construed to recognize any color of title

in possessors for mining purposes as against the United States. § 2386. In another section, near the conclusion of the chapter and following all the provisions affecting the question before us, it declares that "no title shall be acquired under the foregoing provisions of this chapter to any mine of gold, silver, cinnabar, or copper, or to any valid mining claim or possession held under existing laws." § 2392.

It is plain, from this brief statement of the legislation of Congress, that no title from the United States to land known at the time of sale to be valuable for its minerals of gold, silver, cinnabar, or copper can be obtained under the pre-emption or homestead laws or the town-site laws, or in any other way than as prescribed by the laws specially authorizing the sale of such lands, except in the States of Michigan, Wisconsin, Minnesota, Missouri and Kansas. We say "land *known* at the time to be *valuable* for its minerals," as there are vast tracts of public land in which minerals of different kinds are found, but not in such quantity as to justify expenditures in the effort to extract them. It is not to such lands that the term "mineral" in the sense of the statute is applicable. In the first section of the act of 1866 no designation is given of the character of mineral lands which are free and open to exploration. But in the act of 1872, which repealed that section and re-enacted one of broader import, it is "*valuable* mineral deposits" which are declared to be free and open to exploration and purchase. The same term is carried into the Revised Statutes. It is there enacted that "lands *valuable* for minerals" shall be reserved from sale, except as otherwise expressly directed, and that "*valuable* mineral deposits" in lands belonging to the United States shall be free and open to exploration and purchase. We also say lands *known* at the time of their sale to be thus valuable, in order to avoid any possible conclusion against the validity of titles which may be issued for other kinds of land, in which, years afterwards, rich deposits of mineral may be discovered. It is quite possible that lands settled upon as suitable only for agricultural purposes, entered by the settler and patented by the government under the pre-emption laws, may be found, years after the patent has been issued, to contain valuable

minerals.  Indeed, this has often happened.  We, therefore, use the term *known* to be valuable at the time of sale, to prevent any doubt being cast upon titles to lands afterwards found to be different in their mineral character from what was supposed when the entry of them was made and the patent issued.

In the present case there is no dispute as to the mineral character of the land claimed by the plaintiff.  It is upon the alleged prior occupation of it for trade and business, the same being within the settlement or town site of Deadwood, that the defendant relies as giving him a better right to the property. But the title to the land being in the United States, its occupation for trade or business did not and could not initiate any right to it, the same being mineral land, nor delay proceedings for the acquisition of the title under the laws providing for the sale of lands of that character.  And those proceedings had gone so far as to vest in the plaintiff a right to the title, before any steps were taken by the probate judge of the county to enter the town site at the local land office.  The complaint alleges, and the answer admits, that on the 20th of November, 1877, the plaintiff applied to the United States land office at Deadwood to enter the land as a placer mining claim, and that on the 31st of January, 1878, he did enter it as such by paying the government price therefor.  No adverse claim was ever filed with the register and receiver of the local land office, and the entry was never cancelled nor disapproved by the officers of the Land Department at Washington.  The right of the government, therefore, passed to him; and though its deed, that is, its patent, was not issued to him until January 31, 1882, the certificate of purchase, which was given to him upon the entry, was, so far as the acquisition of title by any other party was concerned, equivalent to a patent.  It was not until the 28th of July following that the probate judge entered the town site.  The land had then ceased to be the subject of sale by the government.  It was no longer its property; it held the legal title only in trust for the holder of the certificate.  *Witherspoon* v. *Duncan*, 4 Wall. 210, 218.  When the patent was subsequently issued, it related back to the inception of the right of the patentee.

The position that the patent to the plaintiff should have contained a reservation excluding from its operation all buildings and improvements ·not belonging to him, and all rights necessary or proper to the possession and enjoyment of the same, has no support in any legislation of Congress.    The land officers, who are merely agents of the law, had no authority to insert in the patent any other terms than those of conveyance, with recitals showing a compliance with the law and the conditions which it prescribed.    The patent of· a placer mining claim carries with it the title to the surface included within the lines of the mining location, as well as to the land beneath the surface.    The act of Congress of May 10, 1872, contemplates the purchase of the land on which valuable mineral deposits are found ; and its provisions in this respect are retained in the Revised Statutes, § 2319.

Whilst we hold that a title to known valuable mineral land cannot be acquired under the town-site laws, and, therefore, could not be acquired to the land in controversy under the entry of the town site of Deadwood by the probate judge of the county in which that town is situated, we do not wish to be understood as expressing any opinion against the validity of the entry, so far as it affected property other than mineral lands, if there were any such at the time of the entry.    The acts of Congress relating to town sites recognize the possession of mining claims within their limits; and in *Steel* v. *Smelting Co.*, 106 U. S. 447, 449, we said that " land embraced within a town site on the public domain, when unoccupied, is not exempt from location and sale for mining purposes; its exemption is only from settlement and sale under the pre-emption laws. of the United States.    Some of the most valuable mines in the country are within the limits of incorporated cities, which have grown up on what was, at its first settlement, part of the public domain; and many of such mines were located and patented after a regular municipal government had been established.    Such is the case with some of the famous mines of Virginia City, in Nevada.    Indeed, the discovery of a rich mine in any quarter is usually followed by a large settlement in its immediate neighborhood, and the consequent organization

of some form of local government for the protection of its members." It would seem, therefore, that the entry of a town site, even though within its limits mineral lands are found, would be as important to the occupants of other lands as if no mineral lands existed. Nor do we see any injury resulting therefrom, nor any departure from the policy of the government, the entry and the patent being inoperative as to all lands known at the time to be valuable for their minerals, or discovered to be such before their occupation or improvement for residences or business under the town-site title.

The claim of the defendant, under the second special plea, to allowance for improvements made upon the property, is as untenable as his claim to the title. It is asserted under a statute of the Territory, which provides that "in an action for the recovery of real property, upon which permanent improvements have been made by a defendant, or those under whom he claims, holding under color of title, adversely to the claim of the plaintiff, in good faith, the value of such improvements must be allowed as a counterclaim by such defendant." The case presented by the defendant is not covered by the provisions of this law. There can be no color of title in an occupant who does not hold under any instrument, proceeding, or law, purporting to transfer to him the title or to give to him the right of possession. And there can be no such thing as good faith in an adverse holding, where the party knows that he has no title, and that, under the law, which he is presumed to know, he can acquire none by his occupation. Here the defendant knew that the title was in the United States, that the lands were mineral, and were claimed as such by the plaintiff, and that title to them could be acquired only under the laws providing for the sale of lands of that character; and there is no pretence that he ever sought, or contemplated seeking the title to them as such lands, or claimed possession of them under any local customs or rules of miners in the district.

*Judgment affirmed.*