[Civil No. 189.  Filed February 17, 1888.]

[S. C. 16 Pac. 565.]

ALTA MINING AND SMELTING COMPANY, Plaintiff and Appellee, v. THE BENSON MINING AND SMELTING COMPANY, Defendant and Appellant.

1. MINES AND MINING—WRONGFUL CONVERSION OF ORE—MEASURE OF DAMAGES.—Just compensation is the rule of damage generally ap-

plicable in cases of trover and conversion, and in an action for damages for conversion of ores the value of the ore when broken down at the mine, making no allowance for the labor expended in mining, is a proper measure of damage.

2. ESTOPPEL—PARTY ASSERTING IN FAULT.—Where the party asserting an estoppel is guilty of a wrongful and deliberate infraction of the rights of the other party it should not be permitted to shield itself behind the doctrine.

3. MINES AND MINING—APPLICATION FOR PATENT BECOMES PRIVATE PROPERTY—NECESSITY FOR ANNUAL ASSESSMENT WORK.—After the entry of a mining claim for patent and the issuance of the certificate of purchase the land covered thereby becomes private property, the contract of purchase being complete when the certificate of entry was executed and delivered, and thereafter annual assessment work is unnecessary.

AFFIRMED.   145 U. S. 428; 36 LAW ED. 762, 12 Sup. Ct. Rep. 877.

APPEAL from a Judgment of the District Court of the First Judicial District in and for the County of Pima. Wm. H. Barnes, Judge. Affirmed.

The facts are stated in the opinion.

C. C. Stephens, (Geo. G. Berry, of counsel,) for Appellant.

Haynes & Styles, and J. A. Anderson, for Appellee.

WRIGHT, C. J.—This case was tried at the March term, 1886, of the district court of Pima county, before the court sitting as a jury. The suit was brought by the appellee in February, 1885, to recover for the value of certain ore, which it alleged had been taken from the Alta mine in the Harshaw mining district, in Pima county, and converted by appellant to its own use. From the record it appears that Fagan, Harshaw and others owned the Alta mine prior and up to September, 1879; that about that time they made regular entry and payment for the same, in the proper local United States land-office and got a certificate of purchase, and then sold and conveyed the mine to appellee. In the usual course of

the administration of affairs at the land-office at Washington, a patent was issued in January, 1884. Appellant is a corporation organized under the laws of California. Appellee is a corporation organized under the laws of New York. After its purchase, the appellee took possession, and worked the mine extensively up to 1882; in that year it did but little work upon the mine,—less than $100 worth. On the first of January of the following year, J. M. Luttrell, possibly in the honest belief that, by reason that $100 worth of work was not done in 1882, the Alta mine was subject to relocation as forfeited mineral land, attempted the relocation of it, under the name of "Ben Butler Mine." Under this pretense only, as the record shows, Luttrell took possession of the mine, and, early in the summer of 1883, took from it about 19 tons of ore, which appellant bought and reduced to bullion at its smelter. In the latter part of the summer of 1883, Luttrell made a contract with H. H. Scott, by which Scott was to furnish machinery, money, etc., for the further working of the mine, for one-half the net profits. Now, Scott was a brother-in-law of Salisbury, the president and manager of the appellant, the Benson Mining & Smelting Company, and was sent to Luttrell in the interest of appellant, as explained by Salisbury himself. The machinery and means which Scott was to furnish were furnished by appellant; it paid the wage-workers; furnished the pay-rolls,—in short, the fact is clearly deducible from the record, that Scott was a mere nominal party to this contract, the appellant being the actual party. Under this contract something like 167½ tons of ore were taken out of the Alta mine, and were sent to and reduced by the smelting works of appellant. The Court found for the plaintiff and appellee, for the value of the ore when broken down at the mine,—when it first became a chattel,—estimating the same at $20 per ton; thus allowing for the cost of transportation to appellant's smelting-works, and the cost of reduction, but making no allowance for the labor expended in the mining of the ore,—that is, in converting it from realty into chattels.

Has the appellant been wronged by this judgment? Did

the measure of damages fixed by the court mete to it an injustice? If the evidence in the case supports the ninth and tenth findings of the court, or if the evidence conflicts, even though it much preponderates against those findings, the answer to these questions must be in the negative. It is unnecessary to cite a single authority as to the plain and well-defined power and established duty of appellate courts, when the evidence is conflicting or tends to support the verdict or finding, or is even against the weight of evidence at *nisi prius.* The said ninth and tenth findings of the court below are as follows: "(9) That the said entries and trespasses of said Luttrell and Scott, upon said Alta mine, were each and all with the knowledge of plaintiff's ownership thereof. (10) The defendant, at the time it received said ores, had knowledge that they came from said Alta mine, and that they were the property of plaintiff." We think the evidence justified these findings. Luttrell himself testified that he had known the Alta mine since as far back as 1879, and that he knew that Fagan, Harshaw and others, the grantors of appellee, were the owners of it at that time. He also testified that he knew about the time when the mine was sold to the appellee, and that he knew, as early as 1880, that plaintiff and appellee's grantors had entered the mine in the United States land-office, and had made application for a patent thereto, at a cost of some $800. Thus he had ample information to put him on his guard lest he invade the rights of others; to impart notice to him,—such notice as, of itself, imputes knowledge. Ignorance of the law is no excuse for its infraction; and therefore Luttrell's not knowing that assessment work did not have to be done by the appellee was no justification of his trespass. The evidence further shows that in October, 1883, when Luttrell was in Tombstone to procure medical attendance for a physical injury, Salisbury and Scott told him they had taken steps to prevent a patent to the Alta mine being issued by the government. Salisbury was the president and chief owner of appellant, the Benson Mining & Smelting Company; his knowledge, therefore, was the knowledge of appellant; and here it is revealed that he

had absolute knowledge that the Alta mine had been entered and an application made for a patent; for he had employed a lawyer at Washington and taken steps to prevent the issuance of the patent. Subsequent to the time when appellant took these steps to prevent the issuance of the patent, the bulk of the ore, as shown by the evidence, was taken from the Alta mine, and reduced by appellant at its reduction works. Mr. Salisbury himself testified: ''There had always been some talk about a conflicting claim, because it was a mine located by Luttrell on account of assessment work not being done. That was the reason I investigated the title.'' If he was not an interested party, why did he investigate the title? If he had no knowledge of the *status* of affairs, why did *he* employ a lawyer at Washington, and take steps to prevent the issuance of a patent? We think the evidence amply justified the findings, and that appellant was fortunate in having so reasonable a measure meted out to it. It was immaterial, however, whether appellant knew, at the time it converted the ore, that it belonged to appellee or not. If Luttrell and Scott were guilty of a willful wrong, appellant would be liable to the same rule of damages as would be applicable to them; and this, though it bought the ore without notice or knowledge that it belonged to the Alta Mining & Smelting Company, the appellee.

Just compensation is the rule of damage generally applicable in cases of trover and conversion, and is the one which the learned judge who tried this case seems to have applied. A more stringent rule would probably have furnished the appellant no just cause of complaint. In the celebrated *Wooden-Ware Case,* decided by the United States supreme court, in 106 U. S. 432, 1 Sup. Ct. Rep. 398, Mr. Justice Miller, in rendering the opinion of the court, quotes approvingly Lord Hatherley, in the house of lords, in *Livingstone* v. *Coal Co.,* 5 App. Cas. 25. In that case Lord Hatherley says: ''There is no doubt that if a man furtively, and in bad faith, robs his neighbor of his property, and, because it is under ground, is, probably, for some little time not detected, the court of equity in this country will struggle, or,

I would rather say, will assert its authority to punish the
fraud by fixing the person with the value of the whole of
the property which he has so furtively taken, and making
him no allowance in respect to what he has done, as would
have been justly made to him if the parties had been working
by agreement.'' We entertain no doubt whatever that the
rule of damages applied by the trial court in this case was
eminently just to appellant. See *Wooden-Ware Co.* v. *U. S.*
106 U. S. 432, 1 Sup. Ct. Rep. 398; *Winchester* v. *Craig,* 32
Mich. 205, 61 Am. Dec. 239; *Greeley* v. *Stilson,* 27 Mich. 154;
*Moody* v. *Whitney,* 38 Me. 174; *Maye* v. *Yappan,* 23 Cal. 306;
*Barton Coal Co.* v. *Cox,* 39 Md. 1, 17 Am. Dec. 525, and the
very able review of the cases found therein.

The learned counsel for appellant relies upon the doc-
trine of estoppel in this case, and has invoked the wholesome
paraphrase that ''where one has been silent when conscience
required that he should have spoken, he shall not be heard to
speak, when conscience requires that he should be silent.''
We do not think that the doctrine of estoppel should apply
in this case. The appellee was not silent when it should have
spoken. After Luttrell and Scott had furtively worked the
appellee's mine a few months, it, or rather its grantors, the
government, spoke so loud in the issuance of its patent that
appellant suddenly decamped, removing its machinery, etc.,
in the night, notwithstanding it had employed counsel in
Washington, and had taken steps to prevent the issuing of
the patent. The doctrine of *estoppel in pais* is closely allied
that old equitable rule that no one shall take advantage of
its own wrong. The court below found, and we think rightly
so, from the evidence, that the possession of Luttrell and
Scott was wrongful; that the taking out of the ore by them
was wrongful, and that the conversion of the ore by appellant
was wrongful. Appellant ought not now to be permitted to
shield itself behind the doctrine of equitable estoppel *in pais*
and have thereby flow to it an advantage from its wrongful
and deliberate infraction of its neighbor's rights. Besides
there is no evidence that appellee knew anything about the

furtive operations of Luttrell and Scott, or the appellant, until after those operations had ceased in December, 1883.

But the question upon which the learned counsel insists with greatest stress is that Luttrell had the right to relocate the mine on January 1, 1883, because the assessment work had not been done in 1882; that, notwithstanding appellee's grantors had made regular entry of and application for a patent to the mine, the assessment work had to be done until the patent issued. This position, although maintained with all the force of ingenious and subtile reasoning, is, we think, untenable. The law has been settled the other way. When the entry was made, and the certificate of purchase was given, the land covering this mine became segregated from the mass of public lands, and was thenceforth private property, the contract of purchase being complete when the certificate of entry was executed and delivered. The government, subsequently to this time, held the naked legal fee, until the patent was actually issued, in trust for the purchaser, who had by that entry and certificate become the equitable owner; and the land thereafter ceased to be a part of the public domain. The property thus acquired thereafter became subject to territorial taxation. The ownership of the property was changed as soon as the entry was made according to the terms and in the manner prescribed by law. The patent, when issued by operation of law, related back to the date of the original entry. Now, the logic of the learned counsel for appellant, to be consistent, must be that the effect of a failure to do the assessment work on a mine,—to the owner of which no patent has yet issued, although entry has been made and certificate been given,— is to throw such mineral land back into the public domain, or rather, perhaps that it has never become segregated from that domain; and that, therefore, if the assessment work has not been done in any year up to the issuing of the patent, the mine becomes subject to relocation. Counsel admits that in regard to agricultural lands the party making entry and getting the certificate becomes the equitable owner from the date of such entry, the government being a mere naked trus-

tee of the legal title; but contend that as to the mineral
lands it is different,—that the great purpose of the govern-
ment and of the legislation of congress has been to develop
the mineral resources of the country.   This is true; but has
not one of the great purposes of the government and of the
legislation of congress been to develop the *agricultural* re-
sources of the country also?   And is there any good reason
why the same rules of law should not govern, and the same
legal principles apply, in the conveyance by the government
of the one class of lands that govern and apply in its con-
veyance of the other?   True, different regulations as to
the price per acre, number of acres, etc., have been made
as to the two classes of lands.   Some of the preliminary steps
entitling one to make entry in the one class are different
from those entitling him to make entry in the other; but when
legal entry has been made, and a certificate of purchase is-
sued in either class, is not the equitable title which follows
in the one as absolute as that which follows in the other?
Why should it not be?   There is no difference.   The supreme
court of the United States, in repeated decisions, has put
the matter beyond cavil.   In *Deffeback* v. *Hawke,* 115 U. S.
405, 6 Sup. Ct. Rep. 95, Mr. Justice Field, in delivering the
opinion of the court, said, "On the twentieth day of No-
vember, 1877, the plaintiff applied to the United States land-
office at Deadwood to enter the land as a placer mining
claim, and on the thirty-first of January, 1878, entered it
as such, by paying the government price therefor.   No ad-
verse claim was ever filed with the register and receiver of
the local land-office, and the entry was never canceled nor
disapproved by the officers of the land department at Wash-
ington.   The right of the government therefore passed to
him, and though its deed, that is, its patent, was not issued
to him "till January 31, 1882, the certificate of purchase
which was given to him upon the entry was, so far as the
acquisition of title by any other party was concerned, equiv-
alent to a patent."   It must be borne in mind that this case,
like the one at bar, involved the title to mineral land.   Now
it will not be pretended that, if the Alta Mining & Smelting

Company had had a patent, instead of a certificate of pur-
chase, at the date of said certificate, no assessment work
would have been necessary. If it be true that upon making
the entry and obtaining a certificate of purchase an equitable
title accrued to plaintiff, and the land entered became the
private property of plaintiff, and ceased to be a part of the
public domain, why was there any greater necessity that as-
sessment work should be done in the one case than in the
other? The plaintiff had bought and paid for that much
mineral land, and had obtained the government's certificate
of purchase. The purpose of the government, as to that
part of the public domain, was thereby fully subserved. It
became a matter immaterial to the government whether as-
sessment work was done or not; as much so as to whether a
farmer who had acquired equitable title to agricultural land
by entry and certificate of purchase should put his fields in
barley or rye, or should not cultivate them at all.

Pending the entry, no adverse claim was filed in the local
land-office at Pima county, nor was the entry ever canceled
or set aside in the land department at Washington. The
Alta mine was, then, not subject to relocation on January 1,
1883, when J. M. Luttrell attempted to relocate it, and
took possession thereof. It had ceased to be a part of the
public domain. This Luttrell knew, or should have known.
He was a mere trespasser, without even color of title; for,
as the supreme court of the United States says in *Deffeback*
v. *Hawke, supra:* "There can be no color of title in an oc-
cupant who does not hold under any instrument, proceeding,
or law purporting to transfer to him the title, or to give him
the right of possession. And there can be no such thing as
good faith in an adverse holding when the party knows he
has no title, and that, under the law, which he is presumed to
know, he can acquire none by his occupation." Brave words,
these, but plump with the flesh of truth. This is the delib-
erate adjudication of our great tribunal of final resort. From
this central judicial oracle come those decrees which consti-
tute the highest law of the land. Luttrell is presumed to
have known the law. He is presumed to have known that

appellee's grantors had entered the Alta mine in the United
States land-office; had paid the purchase money for the same,
and had gotten a certificate from the government to that
effect; that, under the law, on January 1, 1883, when he at-
tempted to relocate the mine, no assessment work had to
be done upon it, for it had ceased to be a part of the public
domain, and therefore was not subject to relocation; and
that, under the law, "there can be no such thing as an ad-
verse holding where the party knows he has no title," and
no such thing as good faith in such holding. Certainly, if
the mine was not subject to location, he could gain no title
by attempting to locate it. All this Scott and the appellant,
through Salisbury, its president and manager, knew, or should
have known,—are presumed to have known,—and must be
held responsible for not knowing. See *Deffeback* v. *Hawke*,
115 U. S. 392, 6 Sup. St. Rep. 95; *Witherspoon* v. *Duncan*, 4
Wall. 210; *Carroll* v. *Safford*, 3 How. 441; *Courchaine* v.
*Bullion Mining Co.*, 4 Nev. 369; *Kahn* v. *Telegraph Co.*, 2
Utah, 174; *Stark* v. *Starrs*, 6 Wall. 418.

We are inclined to the belief that this was willful, delib-
erate, and intelligent trespass. At all events, we are cer-
tain no injustice has been done to appellant. The judgment
is therefore affirmed.

Porter, J., concurred in the decision.