Plaintiff brought an in rem proceeding (§§ 6-6-560, et seq.) to quiet title to certain property in Baldwin County, claiming entitlement on the basis of adverse possession. Defendants counterclaimed, alleging that they, together with Plaintiff, were cotenants and seeking partition of the land in question. The trial Court, under ARCP 49 (b), required the jury to return a special verdict in the form of written findings upon three issues of fact. The questions and the jury's written findings are set forth as follows:
"1. Were the parties co-tenants? Yes
"2. If the answer is yes, was there an ouster? Yes
"3. If the above answer is yes, did the Plaintiff exercise adverse possession of the property ten years next preceding July 22, 1974? Yes."
From the Court's judgment in favor of Plaintiff, Defendants appeal.
The facts giving rise to this suit are substantially as follows: In 1905, C.F. Grice received a conveyance, but never took possession, of an 80-acre tract of land in Baldwin County, which is the subject of this action. C.F. Grice died in 1912, leaving five children: Charles Dudley, Marion, Annie, Bertha, and Robert. Appellee (Plaintiff below) Mary Y. Grice is the daughter of Charles Dudley. Appellants are Lexine Grice (widow of Marion) and Marjorie Grice Van Meter (daughter of Robert).
In 1924, Claude Justice acquired a tax deed to the subject property; and, though never living thereon, he assessed and paid the taxes in his name until his death in 1959. He also executed numerous timber, turpentine, and oil leases during this period. In 1955, Charles Dudley built a house on the land which he occupied with his daughter, Mary Y. Grice (Appellee), until his death in 1962. At the time he began to occupy the land, Charles Dudley assessed the property in the names of himself, his brothers, and his sister. In 1957, he executed a mortgage in which he declared himself and his daughter as owning an undivided one-fourth interest in the land. (One of C.F. Grice's children had since died without leaving heirs, thereby accounting for the one-fourth, rather than one-fifth, interest claimed.)
In 1957, Claude Justice filed an ejectment suit to recover possession of the subject property. In response to the suit, Charles Dudley filed a motion requesting the court to ascertain the amount of taxes due to Justice, as well as other expenses, and alleging that the heirs of C.F. Grice had remained in possession of the subject property continuously since the tax sale.[1] No further action was taken in connection with that suit, which abated upon Justice's death.
Charles Dudley, who died in 1962, is survived by his daughter Mary — Plaintiff/Appellee. Plaintiff assessed and paid taxes on the property for the years 1963 through 1967. In 1968, the assessment in Plaintiff's name was not paid and the property was sold to the State for tax delinquency. The property remained on the delinquency docket from 1968 through 1972. In 1973, Plaintiff redeemed the property from the State and thereafter continued to pay the assessment. She brought this quiet title action in 1974.
Two dispositive issues are urged by the Appellants (Defendants below): 1) That the evidence adduced at trial was legally insufficient for a jury finding that Plaintiff had "ousted" Defendants so as to have terminated their cotenancy relationship; and 2) that Justice's tax deed was invalid and, therefore, could not have operated to terminate the cotenancy existing among C.F. Grice's heirs upon his death in 1912.
Appellee (Mary Grice), on the other hand, contends: 1) There is ample evidence of ouster to support the jury's second "special finding"; and 2) the tax deed, assuming its invalidity, operated, at the very least, as color of title, which, when coupled with the requisite adverse possession, ripened into title. *Page 277 
Appellants counter Appellee's latter contention by asserting that C.D.'s occupation of the land on behalf of himself, his brothers and sister, beginning in 1955 and continuing until his death in 1962, created a new cotenancy among the parties, even assuming that the original relationship had terminated.
Before addressing the contentions of the parties, we return to the record for a more complete understanding of the trial Court's final decree. After reviewing the pleadings, the evidence adduced at trial, and the jury's response to the three "special findings", the Court's "Final Judgment" recites:
 "C.D. Justice was the owner of said property in 1955. Plaintiff's father and his two brothers and sister had no title to said real property when Plaintiff and Plaintiff's father, in 1955, went into possession thereof for the benefit of themselves and of Plaintiff's two uncles and aunt. The jury has found that they were at some time tenants in common. The earliest time this could have occurred was in 1955. The jury having found that the Plaintiff ousted the co-tenants and exercised adverse possession of the property during the ten years next preceding July 22, 1974, the naked possession by said tenants in common, continuing for less than ten years, did not continue for sufficient duration to ripen into any title on the part of said Charles D. Grice, Robert Grice, Marion Grice and Annie Grice Daughtery.
 "The Plaintiff has, under the provisions of Section 6-6-566 (c) of the Alabama Code of 1975, established conclusive evidence of title to said lands in the Plaintiff against the Defendants, Lexine D. Grice, Annie Grice Daughtery, Marjorie Grice Van Meter, and the unknown heirs of C.D. Justice, and against all other persons. . . . The Defendants, Lexine D. Grice, Annie Grice Daughtery, and Marjorie Grice Van Meter, have no title to said property nor any interest therein, and are not entitled to a partition thereof."
The trial Judge's findings and conclusions of law are abundantly clear: Given the fact that Justice's tax deed ripened into title at some point in time between 1924 and 1955 (which finding is amply supported by the evidence), the Grice heirs "had no title" when Plaintiff and her father went into possession of subject property in 1955. Given the further facts (as found by the jury) that the Grice heirs were tenants in common in 1955 and that Plaintiff (Mary) ousted her "cotenants" and adversely possessed the property against them "during the ten years next preceding July 22, 1974" (the filing date of the instant litigation), the Grice heirs, other than Mary, did not possess adversely to the Justice heirs for the requisite ten-year period. Thus, Mary alone, to the exclusion of the remaining Grice heirs, adversely possessed the property against the Justice heirs so as to ripen her title in the property.
The trial Judge calculated the relevant time periods as follows: Because Mary's adverse possession against the remaining Grice heirs commenced not later than July 22, 1964 (commencement of the ten-year period), and because the cotenancy relationship had its earliest inception in 1955, the duration of this period of adverse possession was only nine years. Thus, reasoned the trial Judge, Mary alone, either by "tacking" her period of adverse possession to her father's, or in her own right (from the date of her father's death in 1962 to the date of the filing of the instant action in 1974), has possessed the property adversely to the Justice heirs for the requisite period.
On the one hand, then, the jury's "special findings" reflect: 1) The relationship among the Grice heirs as cotenants; 2) the ouster by Mary as against the remaining Grice heirs; and 3) Mary's adverse possession of the property as against these heirs (the Defendants); while, on the other hand, the central thrust of the trial Court's rationale for its holding is the Grice heirs' adverse possession against Justice and his heirs. Having held that the Justice heirs had been divested of title by adverse possession of the property by Charles Dudley and his daughter Mary, the trial Court then *Page 278 
turned to the ultimate inquiry: Whether such adverse possession inured to the benefit of Mary alone, or to the benefit of all the Grice heirs? It was to this latter inquiry that the Court submitted the three "special findings" to the jury; and it was the jury's responses thereto that the trial Court incorporated into its "Final Judgment," upholding title in Mary to the exclusion of the remaining Grice heirs.
Understandably, then, counsel for the parties have concentrated their arguments, in large measure, on the sufficiency of the evidence bearing on the issue of ouster. Whether the legal principle of ouster is a viable issue, however, is dependent upon the validity of the jury finding that the parties (i.e., the Grice heirs) were cotenants. Put another way, only if the parties were cotenants is the question of ouster relevant to the ultimate issue of title to the subject property. This is true because cotenants, absent ouster, cannot hold adversely one against the other.[2]
Upon C.F. Grice's death in 1912, the subject property descended to his heirs, holding as tenants in common. This cotenancy among the heirs would have continued to exist until extinguished by action of the cotenants or by operation of law; and, although, admittedly, the property was sold for taxes to Claude Justice in 1924,[3] this tax sale, by itself, was not sufficient to terminate the cotenancy. Where property of tenants in common is sold at a tax sale, the cotenancy continues to exist so long as there remains a right of redemption in the owners of the property. Truver v. Kennedy,425 Pa. 294, 229 A.2d 468 (1967); see, also, Severson v. Simon,110 N.W.2d 289 (N.D. 1961).
The statute governing redemption at the time of the tax sale and deed is substantially the same as that now codified in §40-10-120, Ala. Code 1975, with the exception that the redemption period now has been changed from two years to three years. The grace period for owners under a disability extends for an additional one-year period after removal of the disability:
 "Real estate sold for taxes and purchased by the state may be redeemed at any time before the title passes out of the state, or if purchased by any other purchaser, may be redeemed at any time within two years from the date of the sale by the owner, his heirs or personal representatives, or by any mortgagee or . . . an infant or insane person entitled to redeem at any time before the expiration of two years from the sale, may redeem at any time within one year after the removal of his disability. . . ."
(§ 3109, Code 1923.)
Although the statute refers to "two years from the date of the sale," this has been interpreted as two years from the date of issuance of the tax deed, the "final, consummating act of sale." Pugh v. Youngblood, 69 Ala. 296, 298 (1881). Because the tax deed was issued to Claude Justice in 1924, those of the Grice heirs not under a disability at this time had until 1926 to redeem. The youngest of the Grice heirs was 7 years of age at the time of sale; thus, he had one year to redeem after reaching majority sometime in 1938. It follows, then, that the right of redemption in the Grice heirs was lost sometime in 1939.
Appellants argue, however, that the tax sale and deed to Claude Justice were invalid and therefore could not have operated to extinguish the cotenancy. This argument ignores the long-standing law in this State that, regardless of the validity of the sale, continuous adverse possession of the land by the purchaser at a tax sale for three years after he becomes entitled to demand a tax deed, or in fact is lawfully issued one, bars an action to recover the land by the former owner.Trehern v. Wilkerson, 356 So.2d 1185 (Ala. 1978); Odom v.Averett, 248 Ala. 289, 27 So.2d 479 (1946); Bedsole v. Davis,189 Ala. 325, 66 So. 491 (1914). It is *Page 279 
unnecessary to recite the acts of Claude Justice constituting the three years' continuous adverse possession under the then applicable statute (now codified in § 40-10-82). Suffice it to say, there was ample evidence to support the trial Court's finding that C.D. Justice was the owner of the property in 1955.
Nevertheless, in 1955, one of the Grice heirs, Charles Dudley, entered the property claiming it on behalf of himself and his brothers and sister. If these enunciatory acts, including the assessment and payment of taxes in the names of all the Grice heirs, were sufficient to create a new cotenancy among the heirs, it follows that, short of ouster, neither Charles Dudley, nor his daughter (Appellee here), could have possessed the land adversely to the other heirs.
Possession of one cotenant is presumptively the possession of all and inures to the benefit of all. 3 Am.Jur.2d, AdversePossession, § 172 at 256. On the other hand, if Charles Dudley's acts were not sufficient to establish a cotenancy, the foregoing presumption does not apply.
A tenancy in common is defined as that character of tenancy whereby two or more persons are entitled to land in such manner that they have not only an undivided possession, but also several freeholds or interests. Kellum v. Williams, 252 Ala. 71, 39 So.2d 573 (1949), cited in 20 Am.Jur.2d, Cotenancy andJoint Ownership, § 22 at 115; Glass v. Cook, 257 Ala. 141,57 So.2d 505 (1952); Ruffin v. Crowell, 253 Ala. 653, 46 So.2d 218
(1950), cited in 86 C.J.S. Tenancy in Common § 4 at 362. A tenancy in common is thus characterized by a single unity — that of possession, or of the right to possession, of the common property. If such unity exists, there is a tenancy in common, irrespective of the concurrence of any other unities; and, if it does not exist, the estate is not a tenancy in common. Shepard v. Mt. Vernon Lumber Co., 192 Ala. 322,68 So. 880 (1915), cited in 20 Am.Jur.2d, supra, at 116.
In the early case of Smiley v. Dixon, 1 Penrose Watts 439 (Penn. 1830), two persons had purchased from a third person who they supposed had good title, but who, it was afterwards ascertained, had not even color of title. The Pennsylvania Supreme Court held there was nothing in the purported cotenancy to prevent one of the parties from subsequently purchasing the property from the true owner for his own exclusive benefit. The supposed cotenants, by their purchase, had acquired neither possession nor the right to possession, thereby leaving each free to later purchase the property without obligation to the other. See, also, Roberts v. Thorn, 25 Tex. 728, 737 (1860) ("[T]he parties acquired nothing by their purchase, and consequently, had no title or estate to create a tenancy in common.").
If a tenancy in common is characterized by a common possession or right of possession, it follows that C.D.'s entry onto the subject property in 1955 could not by itself create a new cotenancy among the Grice heirs. Only C.D., among the Grice heirs, ever went into possession. Therefore, there was no common possession; and, although C.D. claimed on behalf of himself and the other heirs, such declaration conferred no right of possession in either himself or his brothers and sister, inasmuch as title to the property had become absolutely vested, without right of redemption, in the tax purchaser — Claude Justice. In the absence of possession or right of possession, there was no estate and, thus, no tenancy in common. It follows that the presumption that possession by one cotenant is possession by all does not apply.
The above does not preclude, however, consideration of equitable principles, e.g., resulting and constructive trusts and equitable estoppel or its equivalent, which might support an interest by the Appellants in the disputed land. Freeman onCotenancy and Partition (1886), for example, suggests that even where parties fail to be nominally cotenants, due to the absence of possession or right of possession, equitable considerations may justify the imposition of restraints on the parties as if they were in fact tenants in common: *Page 280 
 "[T]o say generally that co-grantees are not liable to the restraints imposed on cotenants merely because they obtained no title, would be to except out of the general rule those cases in which equitable considerations most imperatively demand its enforcement. No doubt in these, as in all other cases, the test to be applied is to consider the actual relations of the parties rather than their nominal relations. If, notwithstanding the fact that they are named as co-grantees in a deed, they acquired nothing from their purchase, and either never exercised the rights of joint owners, or have ceased to consider themselves within the relation of cotenancy on account of their failure of title, then both should be free to deal with the subject matter of their former purchase. If, on the contrary, though they have no title, the parties continue to regard each other as cotenants, and if, on that account, they are apparently sustaining toward each other relations of trust and confidence, then neither should be at liberty to act in hostility to the interests of the other." Freeman on Cotenancy and Partition, § 163 at 241. (Emphasis added.)
This approach is suggested by the early Alabama case ofColeman v. Coleman, 173 Ala. 282, 55 So. 827 (1911). Mr. Justice Simpson, writing for the Court, held that a former tenancy in common ceased to exist upon foreclosure of the mortgage on the subject property and after expiration of the time for redemption. In that case, as in Smiley v. Dixon, supra, the Court held that "[e]ach former tenant in common . . . had an equal right to purchase that property, just as might have been done to any other property in which they had no title or right. The reciprocal rights of tenants in common necessarily cease when they cease to be tenants in common."Coleman v. Coleman, supra, at 288, 55 So. at 828. But having found the former cotenancy extinguished, the Court went on to consider whether the relationship of the parties was such as to justify the imposition of a trust. The Court concluded, however, that "[t]he facts as stated in the bill are not sufficient to raise either a resulting or a constructive trust in the land." Coleman v. Coleman, supra, at 289, 55 So. at 828.
We also find case authority from other jurisdictions involving tenancies in common which ceased to exist or never came into being, due to absence of a right to possession, in which the parties were held to the same standards toward one another as if they were in fact tenants in common. See, e.g., 2 C.J.S. Adverse Possession § 47, at 711, and cases cited at note 90. Many of these cases involve parties holding a common color of title. Thus, it is stated that the adverse possession of property by one cotenant under a color of title held by all the cotenants inures to the benefit of all so as to ripen title in each according to his respective interest. 3 Am.Jur.2d, AdversePossession, § 172, at 256.
Color of title, even when held in common, however, of itself does not constitute a tenancy in common. Color of title confers no right to possession and, therefore, cannot be an estate held by tenants in common. If a constructive trust is due to be imposed on account of a relationship among the parties arising out of a commonly held color of title, the result, of course, will be the same as if they were cotenants. Nevertheless, there is value in maintaining the distinction between the legal concept of cotenancy, which exists due to the cotenants' equal right of possession, and the principle of a constructive trust which, for equitable reasons, may be imposed upon the parties to create a tenancy in common, even where one did not previously exist.
As already noted, where two or more parties hold a common color of title, the purchase or possession of the subject property is frequently held to inure to the benefit of all. "Color of title" is a writing which, in appearance, purports to transmit title, or the right of possession, but, which, in reality, does not. Bradley v. Gordon, 240 Ala. 556, 200 So. 736
(1941); Bowles v. Lowery, 181 Ala. 603, 62 So. 107 (1913). In general, any instrument purporting to convey the land may be color of title, however *Page 281 
defective or imperfect it is, and no matter from what cause it is invalid. Thus, color of title may be evidenced by a contract for sale of the land, by a quitclaim deed, by a deed for partition, by words of transfer written on the back of a deed, or by a will. 3 Am.Jur.2d, Adverse Possession, § 111, at 195-197.
The "writing" here consisted of a conveyance of the subject property to C.F. Grice, the common ancestor of C.D. Grice and his brothers and sister. Significantly, there is neither a will nor any other "writing" which purports to convey the subject property to the Grice heirs. In Deffeback v. Hawke,115 U.S. 392, 6 S.Ct. 95, 29 L.Ed. 423 (1885), the Supreme Court stated, "There can be no color of title in an occupant who does not hold under any instrument, proceeding, or law purporting to transfer to him the title or to give to him the right of possession." The implication appears clear that merely a deed or conveyance in the name of an ancestor, by itself, is not sufficient to constitute color of title in an heir.
Although, as already noted, color of title is broadly construed to reach any writing which, on its face, purports to transfer title, it must at the very least mean a conveyance to the person claiming "color of title" and not to another. This would appear to follow from the requirement that one who claims color of title must do so in good faith. Deffeback v. Hawke, supra; Goodson v. Brothers, 111 Ala. 589, 20 So. 443 (1896). One cannot claim under color of title when he has conveyed the subject property away to another. He who claims color of title under a writing in the name of another, even though closely connected, is not likely to possess reliable knowledge of the property's subsequent history, whether it was conveyed or, as was the case here, sold for nonpayment of taxes. There is simply insufficient knowledge here upon which to base a claim of color of title in good faith. Likewise, the record before us fails to disclose any facts which would justify the imposition of a trust, constructive or resulting, on behalf of the nonpossessing Grice heirs — Appellants, here. See Coleman v.Coleman, supra.
We find no basis for a finding that the Appellants relied upon any material misrepresentation or for a finding of those elements of a confidential relationship essential to a constructive trust. Cole v. Adkins, 358 So.2d 447 (Ala. 1978). Additionally, it is undisputed that none of the nonoccupying Grice heirs ever contributed to the payment of taxes on the property or to the defense of the ejectment suit brought by Claude Justice in 1957. Nor do we find any other evidence of those monetary elements essential to the imposition of a resulting trust. See Favre v. Austin, 361 So.2d 109 (Ala. 1978).
Thus, if the "equitable considerations" referred to inFreeman are limited to color of title or to the imposition of a trust, neither of which is supported by the evidence in the instant case, the judgment below is due to be affirmed. It is clear, however, from a full reading of Freeman that these categories are not exclusive; nor does Coleman so hold. That the application of these "equitable considerations" is not confined to color of title, imposition of a trust, or to a co-grantee context is borne out in the second sentence of the above quoted language from Freeman: "no doubt in these, as in all other cases, the test to be applied is to consider the actual relations of the parties rather than their nominal relations."
We return again to the record to determine whether there are other equitable considerations which impose restrictions upon the possessing party (the Plaintiff) in like manner as those imposed among cotenants. Understandably, because of the mutually misconceived premise of cotenancy, neither of the parties sought a factual finding as to any special relationship of "trust and confidence" among the Grice heirs as that term is used in Freeman on Cotenancy and Partition. Thus, the record is silent as to any such findings.
Accordingly, we affirm that part of the final judgment below finding that Claude Justice was the owner of the subject property *Page 282 
in 1955 and that his title has been divested by the adverse possession of Charles Dudley Grice and his daughter Mary; and we reverse and remand this cause for further proceedings to determine whether such possession inures to the benefit of Mary alone or to the benefit of all of the known Grice heirs as tenants in common.
In deciding the ultimate issue, we believe the trial Court is bound to find that C.D.'s conduct toward his brothers and sister evinced an unmistakable intent to treat them as cotenants though, in fact, no cotenancy existed. Unquestionably, this is the issue to which the jury was attempting to respond when they answered the first "Special Finding" in the affirmative. Because of the absence of the legal relationship of cotenancy, however, the second "Special Finding" on the issue of adverse possession was misplaced.
The principles of law and equity enumerated in this opinion require that new and different inquiries be substituted for those submitted to the jury in the original proceedings. Given the undisputed initial intent of C.D. to treat all the Grice heirs as tenants in common (thus partially satisfying the first of the two-pronged test suggested in the above-quoted last sentence from Freeman), the remaining inquiry centers on the continuing and sustaining nature of that relationship of trust and confidence among the Grice heirs as it relates to the possession of the property by C.D. and his daughter on behalf of and for the use and benefit of the nonpossessing heirs.
We adopt and paraphrase the Freeman test: Did the given intent of C.D. to treat his two brothers and sister as cotenants create a continuing regard, among all the heirs, of each other as cotenants; and did they, on that account, sustain toward each other relations of trust and confidence, so that, in equity and good conscience, Mary cannot now be permitted to act in hostility to the interest of the other heirs?
Relevant to this inquiry, but not so limited, would be any conduct by C.D., or his daughter Mary, inconsistent with this continuing relationship; and whether such conduct, if any, was brought to the attention of the nonpossessing heirs. Put another way, were the reasonable expectations of the nonresident heirs, arising out of the conduct of C.D. and his daughter, such as would lull reasonable persons into a false sense of security with respect to their interest in the property?
Our suggestion of the pertinent questions is not to be construed in any manner as a suggestion of their answers. We believe it may be instructive to the trial Court, however, to make the following observations: If the issue of ouster were properly before us for decision, we would hold that the evidence falls far short of meeting the Plaintiff's awesome burden of proving ouster where the contesting parties are, in fact, tenants in common. See Tyson v. Jackson, 364 So.2d 1140
(Ala. 1978). But, here again, this is not to be understood as equating Plaintiff's burden of proof as to the issues on remand with the heavy burden cast on a possessing cotenant who seeks to prove ouster, sustaining title by adverse possession against nonpossessing cotenants.
On remand, the trial Court may wish to exercise its discretion in favor of granting the request of either party to adduce further evidence on the remanded issues. An advisory jury is a matter solely within the trial Court's discretion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
TORBERT, C.J., and FAULKNER, SHORES and BEATTY, JJ., concur.
[1] The record before us fails to disclose any evidentiary support for the claim of possession by any of the Grice heirs prior to the possession by C.D. and his daughter in 1955.
[2] See Tyson v. Jackson, 364 So.2d 1140 (Ala. 1978).
[3] The tax sale actually occurred early in 1918, but Justice acquired his tax deed from the State in 1924. *Page 283