**C. W. BRENNAN, Plaintiff,**

v.

**Stewart L. UDALL, Secretary of the Interior, Defendant.**

**Civ. A. No. 8542.**

United States District Court
D. Colorado.

Feb. 16, 1966.

---

12. Credit is due William L. Hinds, Jr., Law Clerk to the Court, for the preparation of this opinion.

Fred M. Winner, Winner, Berge, Martin & Camfield, William S. Livingston, Denver, Colo., Whiteford, Hart, Carmody & Wilson, Washington, D. C., for plaintiff.

Lawrence M. Henry, U. S. Atty. for Dist. of Colorado, David I. Shedroff, Asst. U. S. Atty., and Robert Mesch and Lowell Madsen, Dept. of the Interior, Washington, D. C., for defendant.

WILLIAM E. DOYLE, District Judge.

This case was tried to the Court; evidence was taken, elaborate briefs were filed, and the matter now stands submitted on the basis of extensive testimony and numerous exhibits.

The plaintiff alleges that jurisdiction is conferred on the Court by the Administrative Procedure Act, 5 U.S.C. § 1009. Plaintiff has secured a legal opinion from the Secretary of Interior with respect to the title of plaintiff's predecessor in interest. The opinion of the Secretary adversely affects plaintiff's interests and raises issues which are sufficient to permit the granting of the relief which is here requested. We find sufficient grounds to accept jurisdiction under the provisions of the cited act and thus it is not necessary to determine whether additional jurisdictional basis exists.

Plaintiff alleges that federal question jurisdiction is present (Title 28 U.S.C. § 1331); that jurisdiction is properly based upon mandamus (28 U.S.C. § 1361); and that there is an adequate basis for jurisdiction which would grant declaratory relief (28 U.S.C. § 2201). In view, however, of our conclusion that the Administrative Procedure Act authorizes bringing of the suit and the granting of the relief demanded, it is unnecessary to determine whether the other cited provisions would also vest the Court with jurisdiction.

The defendant maintains that this suit is one that seeks to quiet title and as such is an unconsented action against the sovereign. Defendant further maintains that neither injunctive, mandamus, nor declaratory judgment relief is appropriate for the reason that the plaintiff, so it is argued, can not demonstrate imminent harm nor a clear duty not performed by defendant.

Cases relied on by defendant in support of his position that this Court lacks jurisdiction do not involve the issue of excess of administrative authority, but rather concern only challenges to the correctness of a decision committed by law to administrative discretion. See Switzerland Company v. Udall, 4 Cir. 1964, 337 F.2d 56; Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 7 L.Ed.2d 842 (1963).

Involved herein is the question whether the plaintiff is entitled to the oil shale content of certain lands obtained by plaintiff's predecessor in title through a patent issued pursuant to the Homestead Act (43 U.S.C. § 161), and subject to the conditions of the Act of July 17, 1914, (30 U.S.C. § 121 et seq.).

The history of the Baxter patent in relationship to the 1914 Act is important to our analysis of the plaintiff's several arguments. The application was made in 1907 by one George Baxter. In it he described the land as nonmineral. His entry onto the 160 acres of land in Township 2 South, Range 97 West, 6th P.M. Colorado was also in 1907. On December 18, 1909, Baxter filed with the Land Office at Glenwood Springs, Colorado, his formal application to enter the land under the provisions of the 1891 Homestead Act. Therein the land was described as non-mineral. A receiver's receipt was duly issued. On August 1, 1912, pursuant to the act of June 6, 1912, 43 U.S.C. § 164, Baxter filed notice of his election to make proof under the 1891 Homestead Act under which the entry was made.

On July 17, 1914, Congress passed a statute "to provide for agricultural entry of lands withdrawn, classified, or reported as containing phosphate, nitrate, potash, oil, gas, or asphaltic minerals." 30 U.S.C. § 121. The controversy here centers around the meaning and applicability of this statute. This 1914 Act allowed homestead entry of lands classified as mineral provided that the entryman would agree to reserve in the United States title to the mineral for which the land was classified as valuable.[1] Its purpose was, therefore, to allow the issuance of agricultural patents on mineral lands provided an appropriate reservation was made. Subsequently, on May 23, 1916, the Commissioner, General Land Office, acting pursuant to the 1914 Act, classified some 87,000 acres of oil-shale land in Colorado as mineral lands, valuable as a source of petroleum and nitrogen.[2]

Baxter's land was among the tracts which were classified by the Commissioner on this occasion. On June 29, 1916, the Commissioner advised the Register and Receiver at Glenwood Springs, Colorado, that the classification had been made without withdrawal and would "be operative under and subject to the provisions of the act of July 17, 1914." Baxter did not receive the letter classifying his land as oil-shale land, nor, apparently, a copy of the Commissioner's letter advising the Register and Receiver in Glenwood Springs that the classification had been made pursuant to the 1914 Act.

In any event, when Baxter applied to make final proof before the Glenwood Springs Register, he was advised that he would have to sign a "petroleum waiver." [3] In making final proof on January 13, 1917, Baxter certified that to his knowledge there was no indication of any kind of minerals on the land. The final certificate, issued to Baxter January 25, 1917, contained a notation that the patent was to contain provisions, reservations,

---

1. The pertinent provisions of the 1914 Act are as follows:

"Lands withdrawn or classified as phosphate, nitrate, potash, oil, gas, or asphaltic minerals, or which are valuable for those deposits, shall be subject to appropriation, location, selection, entry, or purchase, if otherwise available, under the nonmineral land laws of the United States, whenever such location, selection, entry, or purchase shall be made with a view of obtaining or passing title with a reservation to the United States of the deposits on account of which the lands were withdrawn or classified or reported as valuable, together with the right to prospect for, mine, and remove the same; but no desert entry made under the provisions of this section and sections 122 and 123 shall contain more than one hundred and sixty acres. All applications to locate, select, enter, or purchase under this section shall state that the same are made in accordance with and subject to the provisions and reservations of the above-mentioned sections." (Title 30, U.S.C. § 121)

2. The pertinent terms of the classification letter are as follows:

"The net result of oil shale investigations already made is that the oil-shale areas in Colorado, Utah, and Wyoming constitute a latent petroleum reserve whose possible yield is several times the estimated total remaining supply of petroleum in the United States.

"While the data at hand are not sufficient to warrant a specific statement as to the total recoverable nitrogen content of these shales, it is believed possible that this will prove so large as to give these deposits a value as a source of nitrogen equal to their value as a source of petroleum.

"In view of the high prospective mineral value of lands underlain by oil-shale deposits it is, of course, apparent that they should not be permitted to be acquired under the nonmineral land laws.

"Accordingly, I hereby classify the tracts listed below as mineral lands, valuable as a source of petroleum and nitrogen, and request that you make the proper notation of the classification upon your records."

3. The pertinent provisions of this form, entitled "Consent to provisions of Act of July 17, 1914 (38 Stat. 509)" are:

"I, * * * hereby apply to have my entry considered as made under the Act of July 17, 1914 (38 Stat. 509)" are: by consent that the patent issued to me thereunder shall contain the provisions, reservations, conditions and limitations of the said act."

conditions and limitations in accordance with the Act of July 17, 1914 "as to nitrates, oil and gas." Consequently, on September 22, 1917, Baxter was issued a patent containing the following language:

"Excepting and reserving, also, to the United States all the nitrate, oil, and gas in the lands so patented, and to it, or persons authorized by it, the right to prospect for, mine, and remove such deposits from the same upon compliance with the conditions and subject to the provisions and limitations of the Act of July 17, 1914 (38 Stat. 509)."

Following the issuance of the patent there apparently were no noteworthy happenings until October 29, 1963. The plaintiff herein at that time petitioned the Director, Bureau of Land Management, demanding a decision that "oil shale" was not included as "oil, gas or nitrate" as used in the 1914 Act. The Bureau of Land Management issued an opinion which became the final decision of the Department, recorded on January 20, 1964.[4] We are called upon to determine the correctness of this decision.

In support of his theory that the Department's decision is invalid and must be reversed, plaintiff advances several arguments: *First*, that the patent itself must be strictly construed; that it fails to contain any mention of oil shale and at this late stage cannot be changed. *Secondly*, that the Secretary of Interior lacked authority to make any kind of reservation under the 1914 Act in Baxter's patent; that the Secretary lacked power to make any kind of a classification in 1916 inasmuch as Baxter had already entered the land and occupied it under the 1891 Homestead Act. In this connection, plaintiff calls attention to what is known as the "Pickett Act" of June 25, 1910, 43 U.S.C. § 141 et seq. This expressly prohibits the President from withdrawing lands entered in good faith under the homestead laws prior to the attempted withdrawal.[5] See United States v. Midwest Oil Co., dissenting opinion, 236 U.S. 459, 510, 35 S.Ct. 309, 327, 59 L.Ed. 673 (1915). The crux of plaintiff's argument in this regard is that the Secretary's power to classify lands cannot be broader than the President's power to withdraw lands.

Plaintiff also argues quite forcibly that the 1914 Act could not in any event be applied to the Baxter land in that it does not and can not have any retroactive effect; that by its own terms, when read

---

4. The decision stated as follows:

"The petitioners have requested a statement setting forth the Government's mineral interest in the SW-1/4SW-1/4 sec. 16, N-1/2NW-1/4, SW-1/4NW-1/4 sec. 21, T. 2 S., R. 97 W., 6th P.M. Colorado. * * * The patent contained an 'oil and gas' reservation pursuant to sec. 3 of the act of July 17, 1914 (30 U.S.C. 123). This decision is limited to whether oil shale is included in the oil and gas reservation.

"The Baxter entry was subject to cancellation prior to July 17, 1914, because it covered lands then valuable for oil shale and thus reserved for disposition under the mineral land laws. 43 U.S.C. 201, 30 U.S.C. 21 Cf. Deffenbach [Deffebach] v. Hawke, 115 U.S. 392, [6 S. Ct. 95, 29 L.Ed. 423] (1885); Colorado Coal & Iron Co. v. U. S., 123 U.S. 307, [8 S.Ct. 131, 31 L.Ed. 182] (1887). But after the act of that date, the entry could be and was passed to patent upon the entryman's consent that the patent to be

issued 'thereunder shall contain the provisions, reservations, conditions and limitations of the said act.' It is clear that it was the intention of the parties to allow patent by reserving the oil shale to the United States and that the appropriate reservation of 'oil and gas' includes oil shale. Smallhorn Oil Shale Refining Co., et al., 52 L.D. 329 (1928)."

5. The statute reads as follows:

"The President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States, including Alaska, and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress." Title 43 U.S.C. § 141. "Withdrawal and Reservation of lands for water-power sites or other purposes."

in conjunction with its history, it applies only to entries made after its enactment.

Plaintiff's third point is that the reservation in question did not reserve oil *shale*; that the 1914 Act under which the reservation was made, reserves oil and gas and that this does not and can not result in a reservation of oil *shale*.

## I.

## WHETHER THE SECRETARY HAD POWER TO CLASSIFY THE LAND IN QUESTION.

It is important to note at the outset that Baxter's patent was an agricultural and surface one and that he signed a waiver agreeing to the reservation of the 1914 Act. He contested neither the validity of the reservation nor its accuracy. At this late date, then, it would have to appear that the reservation was clearly unauthorized in the 1914 Act in order for plaintiff to be entitled to relief on the basis of his present contentions. His argument re the power of the Secretary is for the most part based upon the terms of the Pickett Act of 1910 which grants to the President authority to withdraw lands for various purposes, including classification.[6] There is nothing in the Act which suggests an intent on the part of Congress to limit the Secretary's power to classify lands; rather, the Pickett Act was designed to clarify the President's authority to *withdraw* public lands. See United States v. Midwest Oil Co., supra.

■ In essence, plaintiff's argument is that to hold that there is administrative authority in the Secretary to classify lands would mean that the Secretary would have broader power in this regard than the President. If the power-

ers are indeed the same the argument is cogent; however, we do not think that plaintiff makes a logical comparison. When land is classified by the Secretary as mineral at some time prior to patent, an affected entryman could under departmental regulations contest the accuracy and validity of the classification. However, land *withdrawn* by the President could not be challenged by a person affected. Undoubtedly, this distinction led Congress to limit the President's authority under the Pickett Act. Since, therefore, these two statutes affect the rights of patent applicants in different ways, it has to be concluded that they are distinct powers.

The case of Stockley v. United States, 260 U.S. 532, 43 S.Ct. 186, 67 L.Ed. 390 (1923), relied upon by the plaintiff, is not helpful. There the entryman had submitted all required proof and paid all required fees over two years before the Secretary sought to assert that the land was mineral. The Court held that the Secretary's action followed the expiration of the two-year statute of limitations of the 1891 Homestead Act, 43 U.S.C. § 1165 and for that reason was void. Moreover, in *Stockley*, plaintiff's land had been withdrawn for classification under a presidential decree expressly exempting "existing valid claims." We hold that these distinctions are substantial and that the decision is, therefore, not apposite.

Plaintiff also cites cases in which he argues that the mere entry of land removes it from the sphere of "public" land embraced within the terms of the 1879 Classification Act, 43 U.S.C. § 31, by which the Department has power to classify lands.[7] See, for example, Knapp v. Alexander-Edgar Lumber Co., 237 U.S.

---

6. See footnote 5, supra.

7. "(a) The Director of the Geological Survey, which office is established, under the Interior Department, shall be appointed by the President by and with the advice and consent of the Senate. This officer shall have the direction of the Geological Survey, and the classification of the public lands and examination of

the geological structure, mineral resources, and products of the national domain. The Director and members of the Geological Survey shall have no personal or private interests in the lands or mineral wealth of the region under survey, and shall execute no surveys or examinations for private parties or corporations." 43 U.S.C. § 31(a).

162, 35 S.Ct. 515, 59 L.Ed. 894 (1915); Ard v. Brandon, 156 U.S. 537, 15 S.Ct. 406, 39 L.Ed. 524 (1895). These decisions support generally the proposition that the Acts of Congress show a favorable attitude toward homesteaders and an effort on the part of Congress to protect their rights. But it is to be observed also that Congress has demonstrated a policy of protecting the mineral resources of the United States. It has authorized surface patents to those who might develop the nation's agricultural potential and mineral patents for those able to develop the mineral resources of the country. See United States v. Sweet, 245 U.S. 563, 38 S.Ct. 193, 62 L.Ed. 473 (1918). Hence general expressions of policy are not here controlling.

The case of Work v. United States, 1925, 55 App.D.C. 387, 6 F.2d 690, shows that there is a limit to the Secretary's power to deny homestead patents based on subsequent classification as mineral lands. But there more than two years had passed following plaintiff's filing of final proofs. The case does not, therefore, support the plaintiff's argument here. It does not hold that a vested right to unrestricted patent accrues upon valid entry. To hold that entry gives rise to such vested right would render meaningless the two-year statute of limitations which Congress has provided in the Homestead Act. Such holding would also be contrary to the judicial and the administrative decisions recognizing the right to classify public lands after entry and prior to issuance of patent subject of course, to regulations and the limitations statute. See Milton H. Lichtenwalner et al., 69 I.D. 71 (1962); Stockley v. United States, supra; Regulations of the Department of Interior under the 1914 Act, 44 L.D. 32 (1915).

■■ We conclude that as long as the United States continues as the true owner of lands entered pursuant to the Homestead Act, those lands must be regarded as "public" within the meaning of the 1879 Act and subject to classification and reservation of minerals. We do not determine the extent of Baxter's

right as a result of his entry; nor do we hold that the Secretary could withhold a surface patent to the entryman. We conclude merely that it was not a right to unrestricted patent on the homestead to which he had not filed final proofs. It follows, therefore, that neither the classification of Baxter's land nor the insertion of the reservation to the United States of minerals discovered thereon were rendered invalid by reason of Baxter's prior entry.

■ We have considered plaintiff's further argument that Baxter was given no effective notice of classification and that he was not afforded an opportunity to challenge it. We find that the evidence does not support this contention. The letter from the Commissioner to the Glenwood Springs Register, which is notice, was on file at the office in which Baxter made his applications and proof. The Register clearly advised him by letter of the classification and of the necessity for filing a waiver. The regulations, in effect, provided for a full hearing in the event a classification of land as mineral was challenged. Baxter was apparently interested in obtaining a surface patent; it cannot be held that he took the patent without knowledge. Rather, it would appear that he was not interested in any mineral rights. His signing of the waiver under the mentioned circumstances is inconsistent with the conclusion that he was denied notice of an opportunity to challenge the reservation.

## II.

WHETHER THE 1914 ACT BY ITS TERMS APPLIES TO ENTRIES MADE PRIOR TO ITS ENACTMENT.

■ In arguing that the 1914 Act is not to be read so as to apply to lands entered prior to classification or to lands entered prior to its enactment, plaintiff relies for the most part on the act's legislative history. From this it is contended that the intent of Congress was to not allow classification of lands which had been entered prior to enactment or prior to classification. Legislative history is,

of course, a valuable aid to statutory interpretation where the intent of Congress is questionable. Where, however, the act is not ambiguous its history is much less significant. The first question, therefore, is whether the terms of the act are clear.

Section 3 of the 1914 Act expressly deals with the problem presented when a person enters land subsequently classified, withdrawn or reported.[8]

Section 2 permits persons who have entered lands subsequently classified or withdrawn to establish the nonmineral character of the land.[9] Plaintiff's narrow interpretation of the Act would render these provisions meaningless.

Moreover, the legislative history confirms the clear import of Sections 2 and 3. As plaintiff points out, Senate Bill 60, introduced April 7, 1913, applied to "oil lands" of Wyoming and provided in part that lands * * * "which *have been* withdrawn or classified as oil lands or *are valuable* for oil shall be subject to appropriate entry under the Homestead Laws. * * *." [Emphasis supplied] Passed by the Senate and sent to the House Public Lands Committee,

this bill was completely altered by a substitution of the text of H.R. 15036 for the text of Senate Bill 60 and a corresponding change in the title of the bill. So transformed, the measure was favorably reported, H.R. No. 675, 63rd Congress, second session, and subsequently enacted. H.R. 15036 was, save in minor grammatical respects, identical to the Act as passed; a committee report on it, House Report No. 565, was attached to the above-mentioned report on Senate Bill 60.

The Department of Interior commented on Senate Bill 60 when it was before the House Committee. On September 13, 1913, the Acting Secretary recommended broadening the bill's coverage "to make [it] general in its character and applicable to all public lands withdrawn or classified as phosphate, nitrates, potash, asphaltic minerals, oil or natural gas, in the form suggested by the Department in its report * * * on Senate Bill 603 and reports * * * on H.R. 1783 and 6203." [10]

On May 11, 1914, the First Assistant Secretary stated as follows:

"I am in receipt of your request for report on S. 60, which proposes

8. Section 3 provides as follows:
"Any person who has, in good faith, located, selected, entered, or purchased, or any person who shall locate, select, enter, or purchase, after July 17, 1914, under the nonmineral land laws of the United States, any lands which are subsequently withdrawn, classified, or reported as being valuable for phosphate, nitrate, potash, oil, gas, or asphaltic minerals, may, upon application therefor, and making satisfactory proof of compliance with the laws under which such lands are claimed, receive a patent therefor, which patent shall contain a reservation to the United States of all deposits on account of which the lands were withdrawn, classified, or reported as being valuable, together with the right to prospect for, mine, and remove the same." Title 30 U.S.C. § 123.

9. Section 2 provides in pertinent part:
" * * * Nothing herein contained shall be held to deny or abridge the right to present and have prompt consideration of applications to locate, select, enter, or purchase, under the land laws of the

United States, lands *which have been withdrawn or classified* as phosphate, nitrate, potash, oil, gas, or asphaltic mineral lands, with a view of disproving such classification and securing patent without reservation, nor shall persons *who have located, selected, entered, or purchased lands subsequently withdrawn, or classified* as valuable for said mineral deposits, be debarred from the privilege of showing, at any time before final entry, purchase, or approval of selection or location, that the lands entered, selected, or located are in fact nonmineral in character." [Emphasis supplied] Title 30 U.S.C. § 122.

10. It appears from the record before us that H.R. 1783 served as the model for H.R. 15036 and applied to "any person who has located, selected, entered, or any person who shall *hereafter* locate, select, or enter * * * any lands *which are subsequently* classified, claimed or reported as being valuable for potash. * * *" [Emphasis supplied]

to permit agricultural entry of oil lands in the State of Wyoming. * * *

"Attention, however, is directed to the fact that line 5, page 2, and lines 7 and 8, 12 and 13, and 17, page 3, * * * refers [sic] to 'oil and gas' while in other portions of the bill and in the title of the act, oil only is mentioned, reference to the gas being presumably inadvertently omitted. It is therefore suggested that wherever the word 'oil' appears in the bill the words 'or gas' should be added."

While both the Senate version of Senate Bill 60 and the Secretary's September 13, 1913 letter refer to lands which "have been withdrawn," both documents also refer to lands which "*are* valuable" for minerals. Significantly, the Act does not utilize the ambiguous tenses, nor does its title.

It is clear that Senate Bill 60 was abandoned and the broader H.R. 15036 adopted by the Congress. The Act refers to lands "withdrawn, classified, or reported," and makes special provision for persons who validly enter land subsequently classified, withdrawn or reported as valuable for the named minerals. Thus, neither the history nor the language of the Act supports plaintiff's argument.

The contention that because the Act did not grant the Secretary power to classify lands its terms were applicable only to lands classified prior to entry assumes that the Secretary's classification power is limited by the President's withdrawal power under the 1910 Act. Such assumption, and therefore planitiff's argument here, has been considered and rejected.

Plaintiff's final argument that the 1914 Act must be deemed unconstitutional if applicable to lands entered prior to classification assumes that Baxter had a constitutionally-protected right which was violated by the 1916 classification of his land. This is wholly lacking in merit. As we see it the agricultural lands at all times here involved stood in the shadow of a legislative change such as that which here occurred. The entry, together with the other acts of Baxter, gave him no vested right to a patent free of a mineral reservation.

It must be concluded that the 1914 Act embraced within its terms lands entered prior to classification and prior as well to the passage of the Act. It applied to Baxter's lands and it did not deprive him of any constitutional right.

### III.

### WHETHER "OIL" AS USED IN THE ACT AND IN THE PATENT EMBRACES OIL SHALE.

Plaintiff's final and most cogent argument is that the 1914 Act does not apply to oil shale lands, and thus that the reservation under that Act in Baxter's patent did not affect his rights to the shale; that by not expressly mentioning shale, Baxter acquired the property right to it. Plaintiff argues that oil shale is different from oil, and that in 1914 a reasonable man would have known the two were different. He also argues that the Department of Interior knew the difference in 1914 and that it has treated oil and oil shale differently in administering the public land laws. He concludes that *Congress* in 1914 knew that oil and oil shale were different, and that in failing to include oil shale in the list of minerals in the 1914 Act Congress must be deemed to have intended to exempt oil shale from that Act's terms.

Expert testimony revealed that, notwithstanding the lay concept that they are similar, oil and oil shale differ chemically as well as physically. Oil shale contains an organic hydrocarbon compound termed "kerogen," which is chemically distinct from the hydrocarbon compounds termed "petroleum." There is no clear understanding even today of the exact composition of kerogen; evidently petroleum compounds contain a higher percentage of hydrogen in relation to carbon

than do kerogen compounds. In any event, kerogen decomposes under intense heat to form a liquid oily substance. This substance can be hydrogenated so as to produce several petroleum substitutes. It was pointed out that some naturally-occurring petroleum must also be specially hydrogenated to produce commercially acceptable products. K. E. Stanfield, a Bureau of Mines chemist who has specialized in oil shale studies, testified that in 1915 the process of hydrogenation was not known.

That oil shale is different from oil does not, however, answer the present question—the intent of Congress in 1914 when it used the word "oil" in the 1914 Act. The record reveals that in 1914 very few people knew anything about oil shale, and even the experts were uncertain of its composition. (Indeed, at the present time few people know that oil shale is different.) The first two United States publications discussing oil shale were: "Oil Shale of Northwestern Colorado and Northeastern Utah," an article by E. G. Woodruff and D. T. Day in United States Geological Survey Bulletin No. 581, 1914; and United States Geological Survey Bulletin No. 641–F, Oil Shale in Northwestern Colorado and Adjacent Areas, 1915, by D. E. Winchester. The former article, based on surveys conducted in 1913, reported that shale contained substantial amounts of liquid oil. Winchester, after further research, corrected this impression but referred to "wells" of oil shale and in many other ways conveyed the thought that oil shale contained oil. Assuming that Congress knew about oil shale in 1914, there is nothing to indicate that its knowledge was more than vague and general. Indeed, an examination of several publications discussing oil shale, published in 1918 and 1919, reveal that even at those dates oil shale was considered by "experts" to contain oil. See "Billions of Barrels of Oil Locked up in Rocks," National Geographic Magazine, February, 1918; "A Symposium on Western Oil Shales," The Railroad Red Book, July, 1919; "The Greatest Oil Field is Right Before Our Eyes," The Shale Review, February 10, 1919.

Affidavits of R. G. Spengler, a Bureau of Land Management engineer, reporting the results of his examination of placer mining location certificates in Rio Blanco and Garfield counties, Colorado, during the early 1900's were introduced to reveal the state of knowledge among oil shale placer miners in those early days. No discernible pattern can be traced regarding the manner in which miners located oil shale claims. While many specified oil shale as the mineral for which the location was being made, the majority of certificates mentioned only mineral oils. Furthermore, of the five printed forms supplied by federal officials for use by locators, only one mentioned the word "shale". The twenty to thirty per cent. of the locators who filed handwritten oil shale location certificates did not uniformly include the word "oil shale" or "shale" on their homemade forms. Thus, the record reveals that most miners made no distinction between "oil" and "oil shale" when filing location certificates for oil shale claims in the early 1900's.

Copies of the actual patents issued between 1916 and 1955 on lands classified by the 1916 classification letter as mineral lands, valuable for petroleum and nitrogen, were received as bearing on the practice of the Department of Interior subsequent to the passage of the 1914 Act. A total of 144 patents specifically reserved oil shale under the Act. The first such patent was issued in 1918, the year following the award of Baxter's patent. The following formula appears in these 144 patents:

"* * * reserving * * * oil and gas and all shale or other rock valuable as a source of petroleum and nitrogen * * * upon compliance with the conditions and subject to the provisions and limitations of the Act of July 17, 1914."

Of the remaining 54 patents, one appears to be on land not classified by the

1916 letter and must be dismissed from consideration. The other 53 used a great variety of phrases, such as "oil and gas", "gas and oil", "Oil, gas and nitrate." Baxter's patent appears to be the only one containing the phrase "nitrate, oil and gas."

It must be stressed that all of these patents were issued on oil shale lands, and that the Department considered the reservation phrases sufficient to reserve the oil shale deposits to the United States. While poor draftsmanship cannot excuse failure to delineate sufficiently what rights are reserved when the United States creates surface agricultural interests in public lands, it nevertheless is somewhat significant that all of the patents utilized the word "oil" and referred specifically to the terms of the 1914 Act. If the word "oil" as used in that Act covers oil shale, as the Department maintains, the wording of Baxter's patent would be sufficient to reserve oil shale. We, of course, do not undertake to make any finding regarding other patents issued at later dates.

Plaintiff urges, however, that while the Department's position has been consistent, such consistency lies in a recognition of the difference between oil and oil shale. What the Department's construction of the 1914 Act has been is, therefore, a pertinent inquiry.

The Interior Department apparently first considered oil shale in connection with the 1914 Act in the June 29, 1916 letter from the Commissioner of the General Land Office to the Glenwood Springs, Colorado, Receiver.[11] On May 20, 1920, Instructions of the Department indirectly considering oil shale and the 1914 Act, declared:

"Such classifications of lands containing oil shale have been accepted by the Department as *prima facie* evidence of the value of the lands so classified for mining purposes so as to require agricultural entrymen therefor to accept restricted patents to their claims under the provisions of the act of July 17, 1914 (38 Stat., 509), or assume the burden of establishing their nonmineral character." 47 L.D. 548, 551.

In Dennis v. Utah, 51 L.D. 229 (1925), James W. Bell, 52 L.D. 197 (1927), Smallhorn Oil Refining Co., et al., 52 L.D. 329 (1927), and Union Oil Company of California, 61 I.D. 106 (1953) the Department in a variety of contexts considered oil shale lands as subject to the terms of the 1914 Act. The following from *Smallhorn*, supra, is particularly pertinent:

"The act of July 17, 1914, supra, affects public lands which are withdrawn, classified, or reported as being valuable for 'phosphate, nitrate, potash, oil, gas, or asphaltic minerals.' It will be noted that the words 'oil shale' are not found in said act. But the department has long held that lands classified as valuable for oil shale as a source of petroleum and nitrogen were prior to the passage of the leasing act open to mineral entry under the mining laws of the United States and are open 'to nonmineral entry in accordance with provisions of the act of July 17, 1914.' Instructions of May 10, 1920. * * *

"It has been noted that the main product of oil shale is oil. The department is of the opinion that the word 'oil' as used in the act of July 17, 1914, may properly be construed to include oil shale, * * *." 52 L. D. at 331, 332.

Plaintiff points to two recent departmental decisions to argue that oil shale has been treated as distinct from oil by the Department. Ramon P. Colvert, et al., Colorado 03022, etc., June 28, 1957; State of Utah, et al., 71 I.D. 393 (1964). Neither of these decisions refutes defendant's argument that the Department has consistently construed the 1914 Act to apply to oil shale lands. In *Ramon P. Col-*

11. See page 15, supra.

*vert* one of the parties had applied for a mineral patent on an oil shale placer claim, which patent was challenged by the holder of an oil and gas lease. *State of Utah* involved construction of the 1958 School Lands Selection Act, 43 U.S.C.A. § 851, which act specifies both oil and oil shale. Furthermore, the land involved in *State of Utah* had been classified as valuable for both oil and oil shale. Acknowledgment of the distinction between oil and oil shale by the Department at the late dates of those decisions in no way impugns its construction of the 1914 Act as applying to oil shale lands. We conclude that the Department's administrative interpretation of the 1914 Act does not reveal a consistent distinction between oil and oil shale.

Defendant cites United States v. Hurlburt, 10 Cir., 1934, 72 F.2d 427, to support the argument that the Department's construction of the 1914 Act has received judicial recognition. There the United States sought cancellation of an agricultural patent issued in 1930 to one Hurlburt under the 1891 Homestead Act. The patent, which reserved to the United States "all oil and gas and all shale or other rock valuable as a source of petroleum and nitrogen," was expressly subject to the conditions of the 1914 Act. The land involved had been entered and claimed by Hurlburt in 1915 but included in a 1916 presidential withdrawal of land to create a Naval Oil Shale Reserve. The court affirmed the trial court's holding that Hurlburt's previously-entered land was not subject to the President's withdrawal power under the express terms of the 1910 Pickett Act.[12] The court also made the following observations:

"Furthermore the land was withdrawn as a naval oil shale reserve. Under [Section 3 of] the Act of July 17, 1914, such lands are subject to settlement, and a patent may be is-sued with a reservation of the mineral rights in the United States.[3]" [13]

"The record clearly shows that the Land Office in receiving the application and issuing the patent, considered itself bound by such act."

The comments do in general discuss oil shale in the context of the 1914 Act. However, the court was confronted with a very specific problem, unrelated to the question of the intent of Congress in passing the 1914 Act. The best that can be said for *Hurlburt* in relationship to the case at bar is that it is one of few judicial pronouncements which mention oil shale. No case expressly considering the issue here posed has been cited.

■ The Department's interpretation of the Act which it is authorized to administer is entitled to weight, especially if such interpretation has been long standing and consistent. See Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); United States v. Hurlburt, supra. Such interpretation is not here controlling. We must decide whether the term "oil" as used in the 1914 Act was intended by Congress to broadly cover all known sources of oil, or whether it was intended merely to cover petroleum, bearing in mind that oil shale is not oil and that in 1914 it was regarded by those few who had studied the matter as different from oil, at least to the extent that a rock is not a liquid.

To determine whether Congress, in adopting the word "oil", intended to reserve all sources of oil or merely petroleum, we must look to the general purpose and philosophy of the 1914 Act as shown by its terms and its history.

We earlier pointed out that a bill originally introduced in the House, H.R. 15036, served as the model for what was known as S. 60. The House committee reports on S. 60 and H.R. 15036, together with letters from the Department, show

---

12. Cf. footnote 5, supra.

13. The court's footnote 3 refers to the provisions of 30 U.S.C. § 123 (see footnote 8, supra).

that the amended version broadened the coverage of S. 60, which applied only to "oil lands" of Wyoming. Had Congress referred to "oil lands," or to "petroleum," in the 1914 Act, some support would appear for plaintiff's argument. However, the word of art chosen was "oil".

The Department acquiesced in this choice of words, merely pointing out at one point that inconsistencies in the proposed measure should be remedied by adding the term "gas" where it had been inadvertently omitted. It cannot be seriously contended that the Department in 1914 did not consider oil to cover oil shale but in 1916 did. Nothing in this record supports such suggestion. Rather, the record suggests that if the Department considered the problem at all, it felt the word "oil" as used in the proposed legislation, did include oil shale.

■ The single discussion recorded in the Congressional Record, of which we take judicial notice, involving any of the predecessors of the 1914 Act, reveals that Congress sought to reserve to the United States all sources of oil known at the time.[14] There is no discussion of oil shale. Congress did not consider this problem. Congress was merely considering the general problem of providing for agricultural use of mineral lands. The Act provided for the named mineral lands what the 1909 Coal Act, 30 U.S.C. § 81, had provided for lands valuable because of their coal content. There was no intent to deprive the people of the United States of their collective right to minerals known to exist in the public lands. Congress, in enacting the 1914 Act, was seeking a formula which would allow homesteaders to utilize mineral land for agricultural purposes and which would also preserve the minerals. The purpose and history of the Act, viewed in light of Congress' overall policy regarding the separation of mineral and surface rights to the public lands, points to the conclusion that Congress used the word "oil" in its broadest sense. It intended to encompass every known source of oil. As

it is conceded by both parties that Congress knew oil shale to be a source of oil, it is to be concluded that the broad term "oil" as used in the 1914 Act included oil shale.

Both parties appeal to subsequent legislative enactments of Congress to support their contentions regarding the intent of Congress. The facts are that in the 1920 Mineral Leasing Act, 30 U.S.C.A. § 181 et seq., Congress specifically provided for the leasing of oil shale lands; in 1956 Congress amended the 1914 Act but did not add oil shale to the list of named minerals; in the 1958 School Selection Law, 43 U.S.C.A. § 851, Congress provided for oil shale lands; and in a 1960 Mineral Leasing Act amendment, 30 U.S.C.A. § 241, Congress discussed "oil shale" and "oil-impregnated rock." This record of congressional action can be interpreted to show either a continuing purposeful omission of oil shale from the 1914 Act but purposeful inclusion in the 1920 and 1958 statutes, or a tacit recognition that the 1914 Act covers oil shale. In our view such subsequent actions are of minimal aid in determining anything other than Congress' intent at those times. Certainly, such evidence does not sustain plaintiff's burden of proof regarding Congress' intent in 1914.

Plaintiff finally urges that a 1914 decision of the Supreme Court discussing the meaning of "petroleum" supports the contention that Congress knew oil was not oil shale. Burke v. Southern Pacific Railroad Co., 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527 (1914). The Court there considered the railway land grant act of 1866, which expressly exempted "mineral lands" from its terms, and the failure of the Interior Department to inspect land it deemed "mineral" in connection with a patent application under that act. The Court declared that in construing statutes of Congress, strictly scientific definitions are not controlling when a practical subject has been dealt with in a practical way. 234

14. See 51 Cong.Rec. 10493, 10494 (1914), 63rd Cong., 2nd Sess.

U.S. at 679, 34 S.Ct. 907. Thus "petroleum", though found not a "mineral" in the scientific sense, was construed to fall within the statutory term "mineral" as used by Congress in the 1866 Act. Had Congress utilized the term "petroleum" in the 1914 Act, the definition of that term formulated by the Court in the course of its decision in *Burke* might be given some weight; Congress, however, used the general term "oil", and thus it furnishes plaintiff no support.

*Burke* can in no way be regarded as holding that Congress used the term "oil" so as to exclude oil shale from the terms of the 1914 Act. *Burke,* it should be here noted, *does* hold that a practical statute such as this must be construed in accordance with common usage. The instant case is not one where words capable of general construction have acquired a more narrow technological meaning through judicial construction. See Barber v. Gonzales, 347 U.S. 637, 74 S.Ct. 822, 98 L.Ed. 1009 (1954). The term "oil" must be construed in light of the general usage of the term in 1914 and the purposes of the 1914 Act.

By the 1914 Act Congress sought to make available for agricultural use land classified as mineral land which would otherwise be unavailable to homesteaders. Such purpose was in accord with the legislative policy to create both surface and sub-surface estates for the full development of all the public resources. See United States v. Sweet, 245 U.S. 563, 38 S.Ct. 193 (1918). The same policy was expressed in the 1909 and 1910 acts permitting homestead development of lands classified as mineral because of their coal content. 30 U.S.C.A. §§ 81, 83. If the 1914 Act is inapplicable to oil shale lands, a question is raised as to whether homestead patents could validly be issued by the Department on lands classified as mineral because of their oil shale content. See Diamond Coal & Coke Co. v. United States, 233 U.S. 236, 34 S.Ct. 507, 58 L.Ed. 936 (1914); Leonard v. Lennox,

8 Cir. 1910, 181 F. 760. Under the view that we have taken we are, of course, not called on to decide this issue.

Plaintiff finally argues that the purposeful exclusion of oil shale is understandable under a "compatible use" doctrine—that the mining of oil shale is incompatible with agricultural development of the surface land. This, they say, explains Congress' alleged distinction. This is patently invalid. It is unreasonable to hold that Congress found oil shale mining too destructive of the surface of the land to permit any agricultural use thereof, although no such finding was made concerning the mining of coal or asphaltic minerals. Instead we conclude that the construction of the Department of Interior, which in no way binds this court, is the most reasonable one in light of the Act's purpose.

█ In sum, then, we hold that the plaintiff has failed to sustain his burden of proof. We must, therefore, conclude that the term "oil" as used in the 1914 Act permitting homestead surface patents to issue on mineral lands withdrawn or classified as "oil" or valuable for "deposits" thereof, with a mineral reservation to the United States "of the deposits on account of which the lands were withdrawn or classified or reported as valuable," was used by Congress in a broad, generic sense and that it encompasses all sources of oil which were then known.

It follows that oil shale is covered by the term "oil" as used in the Act, and that the reservation in Baxter's patent under the 1914 Act reserved the rights to the oil shale content of his land to the United States. The decision of the Secretary should be, and the same is affirmed.

The defendant is directed to present to the Court an appropriate form of judgment for the Court's signature. Ten days are allowed for this. Meanwhile, the entry of judgment will be withheld until formal judgment is signed.